IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| FRIENDS OF GEORGE'S, INC. <br><br> PLAINTIFF, <br><br><br> v. <br><br><br><br> STEVEN J. MULROY, *in his official and individual capacity as District Attorney General of Shelby County, Tennessee*, <br><br> DEFENDANT | **Case No. 2:23-cv-01276** <br><br><br> **COMPLAINT FOR VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1871, 42 U.S.C. § 1983** |

**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION WITH INCORPORATED MEMORANDUM OF LAW**

Plaintiff Friends of George's, Inc., (hereinafter "Plaintiff"), by and through its designated attorneys, move this Honorable Court to issue a Temporary Restraining Order preventing T.C.A. § 7-51-1407, as it was amended and signed into law on February 27, 2023, from taking effect on April 1, 2023. Plaintiff also asks that this Court issue a Preliminary Injunction to the same effect.

### I.   INTRODUCTION

Plaintiff Friends of George's, Inc., brought this suit against Defendant District Attorney General Steven J. Mulroy (hereinafter "DAG Mulroy" or "the State") challenging the constitutionality of T.C.A. § 7-51-1407. The statute, which is set to take effect on April 1, 2023, prohibits a person from performing "adult cabaret entertainment on public property; or in a

1

location where the adult cabaret entertainment could be viewed by a person who is not an adult." A first violation of the law is a Class A misdemeanor; a second violation is a Class E felony.

The statute is, on its face, a content-based restriction on speech and expression protected by the First Amendment to the Constitution. The law also discriminates on the basis of viewpoint; it defines the prohibited conduct based on the identity – and the message – of the individual. Alternatively, the law was adopted by the State because legislators disagree with the message of the restricted speech. Thus, the law is presumptively unconstitutional, and can only survive review if it is narrowly tailored to achieve a compelling government interest.

Tennessee has existing laws which prohibit indecent exposure and obscenity in the presence of minors. These statutes, portions of which Tenn. Code Ann. §7-51-1407 incorporates by reference, regulate commercial activity, contain affirmative defenses for parental consent, and place clearly defined time, place, and manner restrictions in place that carefully delineate the locations in which the statutes apply. The State does not have a compelling interest in preventing minors from watching drag shows or in enhancing criminal penalties and broadening already-restrictive speech regulations based solely on the identity – and thus the viewpoint – of the speaker. The statute is far from "narrowly tailored." It does not give citizens a reasonable opportunity to know what conduct is prohibited; nor does it give law enforcement explicit standards by which to enforce the law. Thus, it is void for vagueness, or in the alternative, is so overbroad that it will have a chilling effect by making speakers wary of engaging in First Amendment speech for fear they may be subject to criminal charges.

## II.   STATEMENT OF THE CASE

In October of 2022, Jackson Pride planned to host its third annual pride festival celebrating the diversity of the LGBTQIA community in Jackson and West Tennessee. As a part of the festival,

Jackson Pride planned a family friendly, appropriate-for-all ages drag show to be performed in Conger Park in Jackson.

The statute in question relates to performances by "male and female impersonators," or, colloquially, drag performers. Some cultural history of "drag" as an art form is instructive in analyzing the statute in question. "Drag" is defined as "clothing more conventionally worn by the other sex, especially exaggeratedly feminine clothing, makeup, and hair adopted by a man."[1] Drag is usually performed as entertainment and often includes comedy, singing, dancing, lip-syncing, or all of the above. Drag is not a new art form; nor is it inherently – or even frequently – indecent. Drag has been present in western culture dating back to Ancient Greek theatrical productions, where women were often not permitted to perform onstage or become actors. Instead, male actors would don women's attire and perform the female roles.[2] The earliest productions of William Shakespeare's plays also featured male actors in drag playing the female roles.[3]

By the 1800s, "male or female impersonation" was known as "drag." The vaudeville shows of the late 1800s and early 1900s popularized drag, or "female impersonators."[4] One of the most well-known vaudeville female impersonators, Julian Eltinge, made his first appearance on Broadway in drag in 1904.[5] By 1927, drag had become specifically linked with the LGBTQIA community, and by the 1950s, drag performers began performing in bars and spaces that

---

[1] *Drag*, OxfordLearnersDictionary.com,   (last visited March 25, 2023).

[2] Ken Gewertz, *When Men Were Men (and Women, Too)*, The Harvard Gazette (July 17, 2003),

[3] Lucas Garcia, *Gender on Shakespeare's Stage: A Brief History*, Writer's Theatre, (November 21, 2018),

[4] Nan Alamilla Boyd, Wide Open Town: A History of Queer San Francisco to 1965, University of California Press, 2003.

[5] Michael F. Moore, Drag! Male and Female Impersonators on Stage, Screen, and Television: An Illustrated World History, McFarland & Company, 1994.

specifically catered to gay people. In the decades that followed, drag solidified itself as an art form.[6]

Although drag is still centered around and holds special historical significance for the LGBTQIA community, the art form is now definitively a part of mainstream culture. One is as likely to find straight people at a drag show as gay people. RuPaul's Drag Race – a drag competition television show – has won seven Emmy Awards and is currently in its fifteenth season. The show has spinoffs in the UK, Australia, Chile, Thailand, Canada, Italy, Spain, and elsewhere.

Like all forms of performance art, drag encompasses a vast spectrum of expression. Every drag performer makes unique choices about attire, choreography, comedy, and music, which can range from a performer in a floor-length gown lip-syncing to Celine Dion songs and making G-rated puns, to the Rocky Horror Picture Show, to sexual innuendo and the kind of dancing one could expect to see at a Taylor Swift or Miley Cyrus concert. Modern drag performances typically do not contain nudity, which is counter to the point of an art form centered around the exaggerated impersonation of the opposite gender. More often than not, drag performers wear more clothing than one would expect to see at a public beach, and many drag shows are intended to be appropriate for all ages.

According to Bella DuBalle, the host of the 2022 Jackson Pride drag show, the event was intended to be "family-friendly and appropriate for people of all ages." Still, DuBalle acknowledged that not every parent is comfortable with even G-rated drag, and that families should make the choice that is right for them.[7] In spite of the benign content of the Jackson Pride drag show, some members of the local community took issue with the event being held in a public park.

---

[6] Nan Alamilla Boyd, Wide Open Town: A History of Queer San Francisco to 1965, University of California Press, 2003.
[7] State Rep, Performer Discuss Controversy of Jackson Pride, WBBJ News, (September 21, 2022)

After aggressive opposition to the event by a vocal minority, city officials and members of the Pride Committee agreed to move the event indoors. But for some people, this heckler's veto was still not enough.[8]

Tennessee state Representative Chris Todd, along with state Senator Ed Jackson and members of the First United Methodist Church, filed a lawsuit in Madison County chancery court, asking the court to declare the drag show a public nuisance, and to permanently enjoin the City of Jackson from granting a permit to Jackson Pride organizers. In the complaint, Plaintiffs argued that a drag show, no matter how benign its contents, is an "adult cabaret," and therefore should not be permitted within 1,000 feet of a church. Eventually, facing protracted litigation and the inherent scheduling pressures of a large event, Jackson Pride agreed to make the event age-restricted to those 18 years of age and older.[9]

In his comments to the press, Rep. Todd stated, "This is not something we agree with and it's not something our children need to be exposed to . . . It's been about protecting the kids in our community from something that is harmful to them. It's not age appropriate."[10] Although Jackson Pride organizers had repeatedly stressed that the drag show was thoroughly vetted to be "family-friendly content" with no lewd or sexual content allowed, Rep. Todd insisted that the drag performances were "clearly meant to groom and recruit children to this lifestyle . . .that is child abuse and we will not have that here."[11] When pressed about how he knew it was child abuse if he had not actually inquired about the show's contents, Rep. Todd repeated, "this type of performance

---

[8] Jackson Pride organizer expresses 'joy,' Rep. Todd calls a 'win' with drag show ruling, Jackson Sun, (October 7, 2022),
[9] *Id.*
[10] *Id.*
[11] *Id.*

5

and its content is the child abuse."[12] Rep. Todd also stated, "I think moving forward, we anticipate that any kind of consideration of a drag queen event be nonexistent, and that they would realize this community is not the place for that."[13] Put simply, H.B. 0009's sponsor explicitly stated that it was his intent to utilize this law for the unconstitutional purpose of prohibiting or chilling speech based solely on the inclusion of "drag queen[s]" in the performances.

Rep. Todd's actions in Jackson were an unconstitutional government infringement on speech protected by the First Amendment. Tennessee already has state laws prohibiting obscenity or indecent exposure in front of minors. Rep. Todd was not seeking to enforce those laws. Instead, he sought to prevent any drag entertainment, no matter how G-rated, from being performed in front of children, because he personally disagrees with the content.

After abusing the state courts to violate the First Amendment rights of Jackson Pride, Rep. Todd "was asked to come up with legislation that would make this much more clear" – that drag performances in front of children are a violation of Tennessee law. In January of 2023, Rep. Todd introduced House Bill 0009, which would ban any performance that qualified as an "adult cabaret" and was "harmful to children" as defined by existing Tennessee obscenity laws from being performed anywhere except an age-restricted establishment. When asked on the House floor why this law was necessary if such conduct was already illegal to perform in front of children, Rep. Todd stated that the bill was intended to cover conduct like that which he "dealt with in my own community this past year." When asked on the House floor if he knew of any instances of children being harmed by "adult cabaret performances," Rep. Todd recounted how his lawsuit forced Jackson Pride to move the family-friendly drag show indoors and to apply age restrictions, and explained:

---

[12] *Id.*
[13] *Id.*

> That's exactly how this bill is structured. It doesn't prevent those performances, but it certainly says they must not be held in front of minors, and we intend to uphold that and expect law enforcement across this great state to uphold that principle and to uphold what we pass here in this legislature.[14]

Rep. Todd's bill passed in the General Assembly and was signed into law by Governor Lee on February 27, 2023. The final text of the bill, which is set to take effect April 1, 2023, reads as follows:

**T.C.A. § 7-51-1407**

> (c)(1) It is an offense for a person to perform adult cabaret entertainment:
>
>> (A) On public property; or
>>
>> (B) In a location where the adult cabaret entertainment could be viewed by a person who is not an adult.

(3) A first offense for a violation of subdivision (c)(1) is a Class A misdemeanor, and a second or subsequent such offense is a Class E felony.

**T.C.A. § 7-51-1401**

(3) "Adult cabaret entertainment"

> (A) Means adult-oriented performances that are harmful to minors, as that term is defined in § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers; and
>
> (B) Includes a single performance or multiple performances by an entertainer;

**T.C.A § 39-17-901**

> (6) "Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse when the matter or performance:
>
>> (A) Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors;

---

[14] 113th General Assembly, 9th Legislative Day, (February 23, 2023)

7

>    (B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and
>
>    (C) Taken as whole lacks serious literary, artistic, political or scientific values for minors;

The broad prohibitions on protected speech, the uncertainty about what specific conduct this law prohibits, the threat of police surveillance, and the fear of felony charges, led Plaintiff to file suit, challenging the constitutionality of the law under the First Amendment.

## III.  ARGUMENT

Plaintiff meets the legal requirements for the Court to grant it a preliminary injunction. As explained below, (1) Plaintiff is likely to succeed on the merits of its claims; (2) Plaintiff is likely to suffer irreparable harm in the absence of relief; (3) the issuance of the injunction would not cause harm to others; and (4) an injunction is in the public interest. *Williamson v. Recovery Ltd. P'ship,* 731 F.3d 60[8,] 627 (6th Cir. 2013) (quoting *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 42[7,] 432 (6th Cir. 2004)). Where Plaintiff demonstrates "irreparable harm which decidedly outweighs any potential harm to the defendant," the "degree of likelihood of success required" is less, and a plaintiff need only raise "serious questions going to the merits." *In re DeLorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir. 1985).

### A. Plaintiff is Likely to Succeed on the Merits of Its Claims.

#### 1. The Law is Subject to Strict Scrutiny.

##### a. The Law is Facially Content Based and Discriminates on the Basis of Viewpoint.

Plaintiff is likely to succeed on the merits because unlike in most applications for injunctions, even preliminary relief, Plaintiffs are *presumed* to be likely to prevail in First Amendment challenges of this nature. Plaintiffs in First Amendment challenges to non-content-neutral restrictions upon speech "must be deemed likely to prevail unless the Government has

shown that respondents' proposed less restrictive alternatives are less effective than [the challenged statute]." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Plaintiff proposes that Tennessee's existing obscenity laws have proven adequate for decades and that prior to the passage of the challenged statute the legislature conducted no inquiry into the historical effectiveness of Tennessee's existing obscenity laws and made no findings as to why additional protections specific to "male and female impersonators" were necessary. Though Plaintiff challenges certain cross-referenced aspects of those statutes in connection with this suit, for purposes of this Motion, Plaintiff contends that those laws adequately serve the State's interest in protecting children.

"A regulation of speech is facially content-based under the First Amendment if it 'targets speech based on its communicative content' - that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Adver. Of Austin, LLC.*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S.155, 163 (2015)). Content-based restrictions are "presumptively unconstitutional, and "can stand only if they survive strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. at 163.

T.C.A. § 7-51-1407 is facially a content-based restriction. It regulates speech and expression "in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse." The statute plainly "defin[es] regulated speech by subject matter," and is therefore subject to strict scrutiny. But the statute goes beyond mere content-based restriction. The law discriminates on the basis of viewpoint. "Government discrimination among viewpoints – or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker – is a more blatant and egregious form of content discrimination." *Id*. at 169.

The State's viewpoint discrimination is evident in the statute's definition of "adult cabaret entertainment," which reads in part, "adult-oriented performances that are harmful to minors, as that term is defined in § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers . . ." This definition does not merely address specific subject matter. Rather, the restricted speech is defined in part by the identity of the messenger and "the specific motivating ideology . . .or perspective of the speaker." *Id.* at 168. This is clearly what H.B. 0009's sponsor meant when he said that drag events were "clearly meant to groom and recruit children to this lifestyle," and that his bill was intended to prevent anyone under the age of eighteen (18) from hearing the message that he (inaccurately) perceived.

There are two possible readings of this definition. The first reading requires that a performance is **both** 1) harmful to minors **and** 2) includes a performer of the type listed. Under this reading, the content of a performance could be "harmful to minors" without violating the law, as long as the performer is not a topless dancer, go-go dancer, exotic dancer, stripper, male or female impersonator, etc. Under this reading, whether or not speech violates this law is entirely dependent on the identity - and the viewpoint - of the speaker.

Alternatively, the definition can be read to mean that adult oriented performances are 1) performances that are harmful to minors and separately, 2) performances that feature the enumerated entertainers. While this reading is inclusive of anyone who performs material that meets the "harmful to minors" standard, it penalizes performances by the specified performers *regardless of whether their conduct is harmful to minors.* For example, the law prohibits a drag performer wearing a crop top and mini skirt from dancing where minors might see it, but does not prohibit a Tennessee Titans cheerleader wearing an identical outfit from performing the exact same dance in front of children.

Whichever way the definition of "adult oriented performance" is construed, the statute restricts protected speech of a particular subject matter, and from a particular set of people. The prohibited conduct cannot be defined without referencing both the content of the speech and the perspective of the speaker. It is both a content-based restriction and viewpoint discrimination. T.C.A. § 7-51-1407 is thus presumptively unconstitutional and can only survive if it satisfies strict scrutiny.

### b. The Purpose and Justification for the Law are Content Based

"Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Reed v. Town of Gilbert*, 576 U.S. at 167 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). If the Court finds that the statute is facially content-neutral, but that "an impermissible purpose or justification" underpins the law, then the law is still subject to strict scrutiny.

There is an overwhelming amount of evidence that T.C.A. § 7-51-1407 was "adopted by the government because of disagreement with the message the speech conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Representative Chris Todd, who sponsored the bill in the House, filed suit against the City of Jackson in 2022 to prevent Jackson Pride from hosting a family-friendly, fully vetted, non-sexual drag show. Rep. Todd told the media that drag shows are "clearly meant to groom and recruit children to this lifestyle" and that "this type of performance and its intent is child abuse."

And Rep. Todd has been clear that this bill was motivated by his clash with Jackson Pride, explaining that after the incident, he "was asked to come up with legislation that would make this much more clear." When asked why this law was necessary when Tennessee already has public

indecency and obscenity laws, Rep. Todd explained that the bill was designed to cover conduct like that which he "dealt with in my own community this past year." He recounted how his lawsuit forced Jackson Pride to move their G-rated drag show indoors and apply age restrictions. Then he explained, "that's exactly how this bill is structured. It doesn't prevent those performances, but it certainly says they must not be held in front of minors."[15]

Legislators who championed this bill have been clear: this law was created in direct response to Jackson Pride's 2022 family-friendly drag show. The law targets the free speech and expression of drag performers solely because lawmakers disagree with the message drag communicates. Thus, the statute, even if facially content-neutral, is still subject to strict scrutiny.

### 2. The Statute is Void for Vagueness, or Alternatively, the Statute is Unconstitutionally Overbroad

Overly vague laws are unconstitutional for three reasons. First, due process requires that a law provide "persons of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Second, the law must provide "explicit standards" to law enforcement officials, judges, and juries so as to avoid "arbitrary and discriminatory application." Third, a vague statute can "inhibit the exercise" of First Amendment freedoms and may cause speakers to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 108-9 (1972). T.C.A. § 7-51-1407 fails on all three counts.

The statute prohibits in part adult-oriented performances that are "harmful to minors." The definition of "harmful to minors" is as follows:

---

[15] 113th General Assembly, 9th Legislative Day, (February 23, 2023)

**T.C.A § 39-17-901**

> (6) "Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse when the matter or performance:
>
> > (A) Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors;
> >
> > (B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and
> >
> > (C) Taken as whole lacks serious literary, artistic, political or scientific values for minors

This definition pulls much of its language from *Miller v. California*, 43 U.S. 15, 24 (1973). In *Miller*, the Supreme Court set forth a test to determine whether speech is legally "obscene," and thus unprotected under the First Amendment. The three-prong test controls to this day:

> a) Whether the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest;
>
> b) Whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and
>
> c) Whether the work, taken as a whole, lacks serious literary, artistic, political or scientific value.

The third requirement is "particularly important because, unlike the 'patently offensive' and 'prurient interest' criteria, it is not judged by contemporary community standards." *Reno v. ACLU*, 521 U.S. 844, 873-74 (1997); *see also Ashcroft v. ACLU*, 535 U.S. at 576 ("[T]his Court has indicated that the 'patently offensive' prong of the test is also a question of fact to be decided by a jury applying contemporary community standards."). Whereas (a) and (b) are questions of fact for the jury to decide, prong (c) permits courts to determine, "as a matter of law, a national floor for socially redeeming value." *Reno v. ACLU*, 521 U.S. at 874. Crucially, the challenged statute does not regulate "obscenity" within the meaning of *Miller*. It regulates something more,

13

content that is not obscene for adults but which the government contends has a harmful effect on children. Thus, the government bears the burden of proving that the regulated content restrictions stand up to strict scrutiny.

Precisely which contemporary community's standard applies varies. In *Miller*, the Court held that a jury instruction which defined "community standards" as the state-wide standards of California was not unconstitutional. *Miller*, 43 U.S. at 24. The Supreme Court in *Ashcroft v. ACLU,* 535 U.S. 564, 576 (2002) held that community standards need not be defined by reference to a precise geographic area and that "absent geographic specification, a juror applying community standards will inevitably draw upon personal knowledge of the community or vicinage from which he comes." In *Ashcroft*, as in the case before this Court, the statute restricted speech that was obscene for minors, but still protected speech for adults.

But the Supreme Court's decision in *Ashcroft* was "quite limited," holding only that the law's "reliance on community standards to identify 'material that is harmful to minors' does not *by itself* render the statute substantially overbroad for purposes of the First Amendment." *Id.* at 585 (emphasis original). Tennessee's definition of "community," by contrast, does not rely on either state-wide or nation-wide standards. Nor does it leave the juror to "draw on his personal knowledge." *Id.* Instead, § 39-17-90 defines the word "community" as, "the judicial district, as defined in § 16-2-506, in which a violation is alleged to have occurred." The State has created thirty-one (31) unique, imprecise, and likely conflicting definitions of what is "harmful to minors" – one for each judicial district in the state. Viewed in conjunction with the rest of the statute, this definition of "community" renders the law vague and overbroad – even if 31 separate definitions of "harmful to minors" is insufficient to do so on its own.

Plaintiff is aware of no similar definition of "community" that has survived First Amendment scrutiny. The Tennessee Supreme Court in *Davis-Kidd Booksellers v. McWherter*, 866 S.W.2d 520, addressed whether this balkanized definition of community violated the Commerce Clause where the state sought to regulate the open display of pornographic and overly violent books, videotapes, magazines, and other commercially available media deemed "harmful to minors" anywhere minors are lawfully admitted. T.C.A. § 39-17-914. The Court held that the statute's prohibition on materials that portrayed "excess violence" violated the First Amendment and declined to pass on hypothetical challenges to other types of content, preferring to await future as-applied challenges. *Id.* at 531. Such challenges have not come in the intervening three decades, and subsequent Supreme Court First Amendment cases, specifically *Ashcroft* and *Reno*, have not been kind to the *Davis-Kidd* Court's analysis.

The statute in this case regulates the speech of individual citizens, many of whom move in and out of various judicial districts on a daily basis. Plaintiff is an organization promoting the art of drag that organizes its own performances and whose members are drag performers or event organizers. Plaintiff and its members are likely to cross district lines for their shows. Drag performers often travel around Tennessee to perform in different venues and at different events. A brick-and-mortar bookstore, in comparison, has little cause to worry about violating the community standards of a judicial district other than the one in which it is located.

Additionally, the statute in *Davis-Kidd* provides extremely specific affirmative defenses that narrowed the scope of the restrictions:

**Tenn. Code Ann. § 39-17-914**

>  **(b)** The state has the burden of proving that the material is displayed. Material is not considered displayed under this section if:
>
>> **(1)** The material is:

15

>> **(A)** Placed in "binder racks" that cover the lower two thirds (⅔) of the material and the viewable one third (⅓) is not harmful to minors;
>>
>> **(B)** Located at a height of not less than five and one-half feet (5½′) from the floor; and
>>
>> **(C)** Reasonable steps are taken to prevent minors from perusing the material;
>
> **(2)** The material is sealed, and, if it contains material on its cover that is harmful to minors, it must also be opaquely wrapped;
>
> **(3)** The material is placed out of sight underneath the counter; or
>
> **(4)** The material is located so that the material is not open to view by minors and is located in an area restricted to adults;
>
> **(5)** Unless its cover contains material which is harmful to minors, a video cassette tape or film is not considered displayed if it is in a form that cannot be viewed without electrical or mechanical equipment and the equipment is not being used to produce a visual depiction; or
>
> **(6)** In a situation if the minor is accompanied by the minor's parent or guardian, unless the area is restricted to adults as provided for in subdivision (b)(4).

If the sellers are unclear about the precise community standard for what is "harmful to minors," in their district, they are at least certain about precisely where the prohibited materials must be in order to abide by the law. More importantly, law enforcement officers have clear guidance to follow when they are enforcing the law.

The same cannot be said for the statute at issue in this case. This law broadly prohibits adult cabaret entertainment "in a location where the adult cabaret entertainment could be viewed by a person who is not an adult." Unlike the prohibition in *Davis-Kidd*, there are no affirmative defenses that clarify precisely how far "in a location" reaches. Under this law, a drag performer who performs at a family member's birthday party, held at that family member's own house, could be charged, so long as children *could* view the performance. If a restaurant hosts an age-restricted

drag brunch on Saturday morning, and children outside see the show through the windows, nothing in this law prevents the drag performer from being criminally charged.

The law also contains no exception for parental consent, which the Supreme Court has repeatedly taken issue with. In *Ginsburg v. New York*, 390 U.S. 629 (1968), the Court upheld a law prohibiting\\ the sale of "girlie magazines" to minors under the age of 17, in part because "the prohibition against sales to minors does not bar parents who so desire from purchasing the magazines for their children." *Id.* The Supreme Court specifically distinguished the contested statute in *Reno* from that in *Ginsburg*, finding that user-based software that parents could use to "prevent their children from accessing material which the *parents* believe is inappropriate" was a sufficient alternative to the criminal statute. *Reno v. ACLU*, 521 U.S. at 877 (emphasis original). Parental consent is no defense to the challenged statute, nor is inadvertence on the part of the performer.

T.C.A. § 7-51-1407 does not provide Plaintiffs with a reasonable opportunity to know what conduct is prohibited. And the location restriction is apparently without limit, even extending into the private homes of citizens. More disturbingly, this law does not provide the "precision and guidance necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Tv Stations, Inc.*, 567 U.S. 239, 253 (2012). This statute opens up any of Plaintiff's performances to police surveillance and raids, so that law enforcement can be certain that no children are present or even *could* be present.

"The strictness of the vagueness scrutiny is proportionate to the burden that the law imposes on those whom it regulates. When speech is involved, rigorous adherence to the fair-notice requirements is necessary to ensure that ambiguity does not chill protected speech." *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 422 (6th Cir. 2014).

For Plaintiff, this law imposes a heavy burden indeed. For these reasons, the Court should grant Plaintiff's request for injunctive relief.

### B. If the Law Takes Effect, Plaintiff Will Suffer Irreparable Harm

In addition to having a high likelihood of success on the merits, Plaintiff will suffer irreparable harm if the law is allowed to take effect on April 1, 2023. Plaintiff is barred by criminal penalties from engaging in protected First Amendment expression – the expression that defines the very purpose of Friends of George's. "There can be no question that the challenged restrictions, if enforced, will cause irreparable harm. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020).

A harm need not be inevitable or have already happened for it to be irreparable; rather, imminent harm is also cognizable harm that merits an injunction. *See Helling v. McKinney,* 509 U.S. 25, 33 (1993). Plaintiff's next show begins performances on April 14. If the statute takes effect, Plaintiff will either need to cancel the show, or add an age restriction to an event that has always been open to all ages. This law threatens to force a theatre troupe into a nightclub, because Tennessee legislators believe they have the right to make their own opinions about drag into law. Plaintiff's other option is to proceed as planned, knowing that the Friends of George's drag performers could face criminal – even felony – charges. Such censorship is "a harm that can be realized with actual prosecution." *Virginia v. American Bookseller's Ass'n Inc.*, 484 U.S. 383, 393 (1988).

Plaintiff's harms are irreparable, and its rights can only be protected by injunctive relief.

### C. There is No Hardship to Defendant and the Public Interest Favors Plaintiffs.

When the government opposes the issuance of a preliminary injunction, the final two factors—the balance of the equities and the public interest—merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

*Ashcroft* is again dispositive in this instance. In that case, the Supreme Court upheld a preliminary injunction prohibiting the enforcement of a challenged non-content-neutral law regulating minors' access to pornographic material via the internet because "the Government in the interim can enforce obscenity laws already on the books," and "[n]o prosecutions have yet been undertaken under the law, so none will be disrupted if the injunction stands." *Ashcroft v. ACLU*, 542 U.S. at 671. Likewise, in this instance the State may continue to enforce existing, totally adequate obscenity laws, and no existing prosecutions have taken place and are therefore not jeopardized. Furthermore, the public interest is served by preventing a facially unconstitutional law from taking effect – a law which would inhibit the First Amendment rights of the citizens of Tennessee.

### IV. CONCLUSION

For the foregoing reasons, Plaintiff moves this Court to:

1. Immediately grant a Temporary Restraining Order barring the application and enforcement of Tenn. Code Ann. §7-51-1407 pending a hearing in this matter;

2. Upon hearing, find that Tenn. Code Ann. § 7-51-1407 violates the First Amendment and issue a Preliminary Injunction pending final adjudication of this litigation; and

3. Award any other relief that the Court may deem just and proper to vindicate the rights of Plaintiff.

        Respectfully submitted,

        /s/ *Brice M. Timmons*
        Brice M. Timmons (#29582)
        Craig A. Edgington (#38205)
        Melissa J. Stewart (#40638)
        Donati Law, PLLC
        1545 Union Ave.
        Memphis, Tennessee 38104
        (901) 278-1004 (Office)
        (901) 278-3111 (Fax)
        ***Counsel for Plaintiff***