# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| FRIENDS OF GEORGE'S, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:23-cv-02163-TLP-tmp |
| v. | ) | |
| | ) | |
| STATE OF TENNESSEE, BILL LEE, in his official and individual capacity as governor of Tennessee, and JONATHAN SKRMETTI, in his official and individual capacity as the Attorney General of Tennessee, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| FRIENDS OF GEORGE'S, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:23-cv-02176-TLP-tmp |
| v. | ) | |
| | ) | |
| STEVEN J. MULROY, in his official and individual capacity as District Attorney General of Shelby County, Tennessee, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING TEMPORARY RESTRAINING ORDER**

Tennessee enacted a statute criminalizing the performance of "adult cabaret entertainment" in "any location where the adult cabaret entertainment could be viewed by a person who is not an adult." (ECF No. 19-1 at PageID 93.) This suit seeks to enjoin enforcement of that statute, alleging that it is an unconstitutional restriction on speech under the First Amendment as incorporated by the Fourteenth Amendment of the United States

Constitution.  Plaintiff Friends of George's, Inc. moves for a Temporary Restraining Order ("TRO") and Preliminary Injunction against Defendants State of Tennessee, Tennessee Governor Bill Lee, Tennessee Attorney General Jonathan Skrmetti, and Shelby County District Attorney Steve Mulroy ("Defendants").  (ECF No. 7 & 11.)  Defendants responded (ECF No. 19), Plaintiff replied (ECF No. 20), and this Court held a hearing on the motion.  After reviewing the Parties' filings and considering the arguments from the hearing, the Court **GRANTS** Plaintiff's motion for a TRO.

## BACKGROUND

In March 2023, the Tennessee General Assembly passed, and Defendant Governor Bill Lee signed, Public Chapter No. 2, 113th General Assembly 2023 ("Statute").  (ECF No. 19-1.) The Statute makes it "an offense for a person to perform adult cabaret entertainment," either "(A) On public property; or (B) in a location where the adult cabaret entertainment could be viewed by a person who is not an adult."  (*Id.* at PageID 93.)  The Statute defines "adult cabaret entertainment" as a single or multiple performances by an entertainer that are "harmful to minors, as that term is defined in [Tennessee Code Annotated] § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers[.]"  (*Id.*)  A first violation of this provision is a Class A misdemeanor, and any subsequent violation is a Class E felony.  (*Id.* at PageID 94.)  The Statute will take effect on April 1, 2023.  (*Id.*)

Plaintiff is a nonprofit organization based in Memphis, Tennessee, that produces "drag-centric performances, comedy sketches, and plays."  (ECF No. 10 at PageID 52.)  Plaintiff filed this suit against Defendants under 42 U.S.C. § 1983 alleging that Defendants seek to "explicitly restrict or chill speech and expression protected by the First Amendment based on its content, its

2

message, and its messenger." (*Id.* at PageID 62–63.) And so, Plaintiff moves for an injunction to prevent "this unconstitutional statute from taking effect." (*Id.* at PageID 63.)

The Parties submitted briefs, and the Court held a hearing on March 30, 2023. Neither Party disputes that the Statute restricts expressive conduct—defined as "adult cabaret entertainment"—that could be protected speech under the First Amendment. What the Parties dispute is whether Plaintiff has standing to bring this suit, and whether the Statute is constitutional. Plaintiff contends that the Statute is presumptively unconstitutional because it is a content-based restriction on speech that is also void for vagueness and overbreadth. Defendants counter that Plaintiff lacks standing to bring this suit, and that the Statute is a narrowly tailored content-neutral restriction on speech that passes intermediate scrutiny. The Court will now apply the law to determine whether it must issue a TRO.

## **LEGAL STANDARD**

A TRO is an extraordinary remedy. Courts issue TROs to "preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). The movant—here, Plaintiff—bears the burden of showing they are entitled to a preliminary injunction. *See Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009). Courts consider TRO motions under the same four-factor test for preliminary injunction motions: (1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable harm absent a TRO, (3) whether granting a TRO would cause "substantial harm" to others, and (4) whether the public interest would be served by the issuance of a TRO. *See Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). In cases about a constitutional challenge to a state law, "the first factor [likelihood of success on the merits] is typically dispositive." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir.

3

2021). And the third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ANALYSIS

After reviewing the Parties' briefs and arguments, the Court finds that the factors favor the issuance of a TRO against Defendants. Plaintiff has carried its burden of proof on all four factors, supporting the issuance of a TRO. The Court will now address each factor along with Defendants' arguments in opposition.

**I.     Likelihood of Success on the Merits**

   **A.     Standing**

Before a Court can hear a case, the Plaintiff must show Article III standing. This means that Plaintiff must show that it has (1) it suffered an injury in fact—a legally-protected interest that is concrete, particularized, and actual or imminent, (2) that Defendants likely caused the injury, and (3) that judicial relief would likely redress the injury. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992). The United States Supreme Court has held that overbreadth challenges to a statute restricting free speech justify a "lessening of prudential limitations on standing." *Sec'y. of State of Md. v. Munson*, 467 U.S. 947, 956–57 (1984).

Defendants do not dispute Plaintiff's ability to bring this suit as an organization. But they do argue that Plaintiff has not shown any of the elements for Article III standing. First, they contend that Plaintiff has not suffered an injury. This is because Plaintiff does not allege that it intends to engage in conduct that the Statute prohibits. In that regard, Defendants emphasize that Plaintiff maintains that its upcoming performances—including one scheduled two weeks after the Statute takes effect—"risk no harm to anyone." (ECF No. 19 at PageID 86.) Plus, the Statute has yet to take effect. Second, they argue that Plaintiff—even if it can prove a cognizable

injury—fails to prove both the causation and redressability elements for the State[1], Governor Lee, and Attorney General Skrmetti.  (*Id.* at PageID 88.)  They contend that Plaintiff "has not asserted that either the Governor or the Attorney General has taken or might take any enforcement action against it" under the Statute.  (*Id.*)  And so, Defendants conclude that, because Governor Lee and Attorney General Skrmetti did not cause any injury to Plaintiff, the Court is unable to redress any injury through a TRO enjoining the two.  (*Id.*)

The Court disagrees and finds that Plaintiff has met its burden of proving both Article III and prudential standing.  One of Plaintiff's arguments, which the Court will discuss more fully below, is that the Statute is both vague and overly-broad.  Plaintiff therefore has suffered an actual, concrete, and particularized injury in that it has a reasonable fear of prosecution for conducting shows similar to those it has performed in the past, which may be punishable by the Statute with criminal effect.  For example, Plaintiff's upcoming show will take place on April 14, 2023, and the Statute takes effect just two weeks before that.  Defendants claim this requires too much speculation and the timing is not immediate.  But April 14, 2023, is not the "'some day' intention" which the United States Supreme Court warned about in *Lujan v. Defenders of Wildlife*, to be the type of conjecture that fails Article III's imminence requirement.  504 U.S. 555, 564 (1992).

In the meantime, Plaintiff has to try to sell tickets while deciding whether it should add a previously unnecessary age restriction, cancel the show, or risk criminal prosecution or investigation.  These are not trifling issues for a theatre company—certainly not in the free, civil society we hold our country to be.  Defendants' approach would have Plaintiff, and those

---

[1] In its reply brief, Plaintiff consented to dismissal of Defendant State of Tennessee under the doctrine of sovereign immunity.  (ECF No. 20 at PageID 102.)

similarly situated in Tennessee, eat the proverbial mushroom to find out whether it is poisonous. The law does not require that for standing. Defendant Shelby County District Attorney Steve Mulroy seems to agree, as his one statement in the hearing underscored the "great uncertainty and concern among the people of Shelby County," regarding the Statute's scope. For his part, Mr. Mulroy, as an individual Defendant, consents to this TRO. The Court finds Plaintiff has met its burden of establishing injury.

The Court acknowledges that causation and redressability are closer questions. Defendants maintain that the Statute tasks neither the Governor nor the Attorney General with its enforcement. Defendant District Attorney Mulroy took no official position on whether his office will enforce the law. Plaintiff counters with a citation to Tennessee's divided prosecutorial scheme giving the Attorney General power to begin a criminal prosecution should the local district attorney "peremptorily and categorically" refuse to enforce criminal laws. Tenn. Code. Ann. § 8-7-106. Considering that Mr. Mulroy does not oppose the issuance of a TRO here, the Attorney General's power to enforce this law is murky at the moment. As for the Governor, Plaintiff contends he is "not without power to drive enforcement" of the Statute by employing the Tennessee Constitution's "take care clause" or the Governor's executive power over the State's policing agencies like the Tennessee Bureau of Investigations and Tennessee Highway Patrol. (ECF No. 20 at PageID 102.)

The upshot is that the Statute, which imposes criminal sanctions on those who violate its restrictions on expressive speech, will take effect tomorrow, April 1, 2023. And not only is the Statute vague—as the Court further discusses below—but so is the State's enforcement mechanism for it. At the risk of chilling speech because of the Statute's vagueness, the Court will not let the enforcement mechanism's ambiguity prevent Plaintiff's suit here. The Statute

presents a reasonable risk that both the Governor and Attorney General may investigate and criminally prosecute, Plaintiff for its performances. *See United States v. Stevens*, 559 U.S. 460, (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("The State has not suggested that the newly enacted [speech restriction] law will not be enforced, and we see no reason to assume otherwise. . . Further, the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution.").

Because the Statute still has not gone into effect, granting a TRO will grant Plaintiff relief by preserving the status quo. The Court finds that Plaintiff has met its burden for causation and redressability for purposes of this TRO.[2] Since the Court finds Plaintiff has standing, it will next turn to the merits of the request for a TRO.

**B.    First Amendment Issues**

The Court can think of at least three scenarios in which Plaintiff is likely to succeed on the merits.

**i.    Content-Based Regulation**

Plaintiff argues the regulation here is content-based. The First Amendment generally prevents states from limiting speech and expressive conduct based on the ideas expressed. *Texas v. Johnson*, 491 U.S. 397, 406 (1989). So, content-based regulations are presumptively invalid. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). In *Reed v. Town of Gilbert*, the United States Supreme Court observed that there are two ways to determine whether a law is a

---

[2] The Court requests further briefing from the Parties on this standing issue for the preliminary injunction hearing.

content-based regulation. 576 U.S. 155, 163–64 (2015). First, a law is content-based on its face by "defining regulated speech by particular subject matter." *Id.* Second, a law may appear to be content-neutral on its face but courts consider it to be content-based if it was "adopted by the government 'because of disagreement with the message [the speech] conveys." *Id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Content-based regulations must survive strict scrutiny to be constitutional. *Reed,* 576 U.S. at 171 (2015). This is an exceptionally high bar—it means that the law is presumptively unconstitutional. *Id.* The Court will only uphold the law if it is justified by a compelling government interest, and it is narrowly drawn to serve that interest. *Id.* at 175 (Breyer, J., concurring) (observing that strict scrutiny in speech cases is "almost certain legal condemnation"). The Court will now consider whether the regulation here is content-based.

### a. Facially Content-Based Regulation

The Statute defines "adult cabaret entertainment," as a single or multiple performances by an entertainer that are "harmful to minors, as that term is defined in [Tennessee Code Annotated] § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers[.]" (ECF No. 19-1 at PageID 93.) A reading of Tennessee Code Annotated § 39-17-901 reveals that it largely mirrors the three-pronged obscenity standard outlined in *Miller v. California*, 43 U.S. 15, 24 (1973). In other words, one way to interpret the Statute—the way the Parties discussed it during the hearing—is to read Section 1 of the Statute as requiring that the "adult cabaret entertainment" be both (1) harmful to minors **and** (2) feature any of the performers of the type listed.

Plaintiff argues that this interpretation of the Statute is not merely content-based, but also view-point based because an element of the offense is based on the identity (exotic dancers,

strippers, male or female impersonators, etc.)—that is the viewpoint—of the speaker/performer. (ECF No. 7.) During the hearing, Plaintiff argued that Section 1 of the Statute tracks the same language from the state's existing regulations on adult-oriented establishments as codified in Tenn. Code Ann. § 7-51-1401. But rather than penalize the operators of those establishments, Plaintiff points out that this Statute targets the performers themselves, unlawfully restricting their expressive conduct not only within the confines of heavily-regulated adult-oriented establishments, but virtually anywhere.

Defendants disagree with Plaintiff and contend that the Statute merely lists examples of performers who could be performing obscene acts as defined by Tenn. Code Ann. § 39-17-901. Defendants' basic point is that the statute does not target the identity or viewpoint of the performers, but only the obscene acts in which they publicly engage. The Court finds Defendants' argument problematic.

In *R.A.V.*, the United States Supreme Court held that some types of speech—like obscenity and defamation—can be regulated because of their content. 505 U.S. at 383–84. Hence, while the government may prohibit obscenity as a whole, it may not target only certain types of obscenity without engaging in content-based regulation. In other words, a regulation that prohibits obscenity performed by entertainers like topless dancers, strippers, male or female impersonators but not others could be a content-based regulation that warrants strict scrutiny. (*See* ECF No. 19-1.)

Based on the record so far, Plaintiff has made a likely case for analyzing the Statute under strict scrutiny, which would make the Statute presumptively unconstitutional unless Tennessee can present a compelling government interest. It has yet to do so. The Court

9

therefore finds that Plaintiff has shown a sufficient likelihood of success on the merits to grant this TRO.

### b. Facially Content-Neutral but Considered Content-Based Regulation

One of the Court's concerns with the statute is its redundancy. During the hearing, Defendants agreed with the Court's observation that current obscenity laws already account for much of the conduct that the Statute seeks to punish. When the Court asked exactly what conduct this Statute reaches that is outside the scope of Tennessee's obscenity laws, Defendant initially answered that the Statute adds very little, and later clarified that in their view, the Statute is a time, place, and manner restriction. But this answer raises more questions for the Court as it does little to advance Defendant's position. So this brings the Court to the second way for a law to be considered a content-based regulation: that is, a facially content-neutral regulation adopted by the government "because of disagreement with the message [the speech] conveys." *Ward*, 491 U.S. at 791.

Assuming that the Statute is facially content-neutral, United States Supreme Court precedent under *Reed* requires the Court to consider legislative history. *See Reed*, 576 U.S. at 164. And so the Court now turns to the legislative history to address whether Tennessee enacted the Statute because of its disagreement with a particular message or messenger. In its complaint, Plaintiff traces its grievance from October 2022, when "Jackson Pride planned to host its third annual pride festival." (ECF No. 10 at PageID 52.) Plaintiff alleges that public backlash from the city of Jackson, Tennessee resulted in "city officials and members of the Pride Committee" agreeing to move the event—which included a male or female impersonation otherwise known as "drag"—from a public park to an indoor facility. (*Id.* at PageID 55.)

Plaintiff alleges that the Statute's sponsor, Tennessee State Representative Chris Todd, filed a lawsuit asking a state court to declare the drag show a public nuisance. (*Id.*) Citing Representative Todd's recorded speech from the Tennessee General Assembly's house floor session, Plaintiff points the Court to his comments on how the bill "was intended to cover conduct like that which he 'dealt with in [Representative Todd's] own community this past year.'" (*Id.* at PageID 57.) Particularly, Plaintiff claims that "Rep. Todd recounted how his lawsuit forced Jackson Pride to move the family-friendly drag show indoors and to apply age restrictions." (*Id.*) As Plaintiff presented in its opening argument during the hearing, this statute is view-point discriminatory because it targets "drag queens."

Given the Defendants' lack of a clear answer to the Statute's purpose considering current state obscenity laws, along with the Parties' present filings on the Statute's legislative history, the Court finds that Plaintiff has made a likely case for subjecting the Statute to strict scrutiny here. The Court therefore finds that Plaintiff has a sufficient likelihood of success on the merits to grant this TRO.

### c.   Vagueness and Overbreadth

The United States Supreme Court has "traditionally viewed vagueness and overbreadth as logically related and similar doctrines." *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983). A law is unconstitutionally vague if individuals of "common intelligence must necessarily guess at its meaning and differ as to its application[.]" *Conally v. Gen. Const. Co.*, 269 U.S. 385 (1926). A law is unconstitutionally overbroad if it sweeps in more speech than is necessary to satisfy the state's interest, regulating both protected and unprotected speech. *See Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973). The United States Supreme Court has described the overbreadth doctrine as a "strong medicine," that justifies invalidation of laws that can chill the effects of

11

speech through self-censorship on the regulated, and can spark the harms of selective enforcement on the regulator. *Id.* at 613; *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (noting that overbreadth and vagueness doctrines check the legislature's need to establish minimal guidelines to govern law enforcement to avoid a standardless sweep of enforcement).

At this point, the Court finds that the Statute is likely both vague and overly-broad. As discussed above, Plaintiff argued during the hearing that Section 1 of the Statute tracks the same language from the state's existing regulations on adult-oriented establishments as codified in Tennessee Code Annotated § 7-51-1401. *Compare* Tenn. Code Ann. § 7-51-1401 ("'Adult cabaret' means a cabaret that features topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers[.]") *with* (ECF No. 19-1 at PageID 93 ("[Adult cabaret entertainment] means adult-oriented performances that are harmful to minors . . . and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers[.]")).

To the Parties' knowledge, the same language in § 7-51-1401 has not been challenged for its constitutionality in federal court. Plaintiff argues that while § 7-51-1401's broad language is limited by subsections of that statute, chief among them that the performance must be limited within the boundaries of the adult-oriented businesses, here the Statute reaches the conduct of performers virtually anywhere. Section 2 of the Statute makes it "an offense for a person to perform adult cabaret entertainment," either "(A) On public property; or (B) in a location where the adult cabaret entertainment could be viewed by a person who is not an adult." (ECF No. 19-1 at PageID 93.)

Plaintiff argues that this language could mean just about anywhere. The Court agrees. What exactly is a location on public property or a "location where an adult cabaret entertainment

12

could be viewed by a person who is not an adult"? Does a citizen's private residence count? How about a camping ground at a national park? What if a minor browsing the worldwide web from a public library views an "adult cabaret performance"? Ultimately, the Statute's broad language clashes with the First Amendment's tight constraints.

At the hearing, Defendants characterized the Statute as a time, place, and manner restriction that complements the state's obscenity laws. The Court is skeptical because even if Defendant is correct, the Statute seems to be overly-broad. For a time, place, and manner restriction, it provides no time and manner restrictions. Its place restriction fares little better as it can be reasonably read to mean just about anywhere, including private homes.

Defendants advanced no arguments to these concerns during the hearing. Yet they may very well present satisfactory rebuttals to the Court during the preliminary injunction hearing. But at this point, Plaintiff has met its burden of proving likelihood of success on the merits for purposes of the TRO.

## II.     Irreparable Harm in the Absence of an Injunction

Defendants' dispute over this factor is anchored solely on their contention that Plaintiff lacks standing to sue them. As discussed above, the Court finds that Plaintiff has standing for this TRO. So, the Court will treat this factor as uncontested.

Absent an injunction here, Plaintiff will be barred by criminal penalties from engaging in protected First Amendment expression. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63, 67 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") Because of the Statute's vagueness and overbreadth, it is unclear whether Plaintiff's performances may be penalized. If the Statute takes effect and Defendants prosecute Plaintiff, it will likely suffer irreparable harm with criminal

sanctions. These penalties carry with them, among other things, potential loss of liberty and great reputational harm. But even without enforcement, the vague and overly-broad nature of the Statute can have a chilling effect on speech.[3] Plaintiff has met its burden of proving irreparable harm to it in the absence of an injunction.

### III.     No Substantial Harm to Others and Public Interest

Defendants, assuming that Plaintiff lacks standing to sue, assert that these factors weigh in their favor because "the public has an interest in ensuring that its officials are not subject to an aimless injunction." (ECF No. 19.) Plaintiff alleges that it has been engaging in this type of speech since 2011 without incident, and that granting the TRO will cause no harm "other than potential dissatisfaction by some legislators and members of the public who are under no obligation to attend [Plaintiff's events]." (ECF No. 7 at PageID 45.) The Court also notes that one of the Defendants, Shelby County DA Mulroy favored the TRO, citing the "great uncertainty and concern among the people of Shelby County," regarding the Statute's scope.

Tennessee took an affirmative step by enacting this law. No one has ever been charged under this law because it has yet to take effect. Defendants agreed that the state's existing obscenity laws can prosecute most—and arguably even all—of the conduct that the Statute seeks to regulate. So, issuing a TRO here will preserve the status quo and benefit the public interest by clarifying the scope of a law that could impact the First Amendment rights of Tennessee residents.

---

[3] Plaintiff proffered unopposed evidence to support its contention that other civic groups are also concerned about the Statute's vagueness and overbreadth. (ECF No. 23.) A notable example is from Mystie-Elizabeth Watson, Producer and Director of Absent Friends, a theater organization that hosts a monthly showing of the movie, "The Rocky Horror Picture Show." (ECF No. 23-2 at PageID 139 ("Rather than risk the well-being of its drag performers, Absent Friends made the decision to restrict future performances to audience members 18 years of age and older . . . Were it not for this law, Absent Friends would not have added an age restriction to its monthly performances.").

Plaintiff has met its burden for these last two factors as well.  And the Court finds that all factors favor granting a TRO.

## CONCLUSION

The Court is mindful that a TRO is an extraordinary remedy, and that enjoining enforcement of the Statute precludes, or at least delays, the Tennessee General Assembly's legislative act.  The Court does not take such actions lightly.  But within our country's federal framework, states are laboratories of democracy that can test laws and policies enacted by The People.  Even still, these experiments are not without constraints.  The United States Constitution—a law that is supreme even to the Tennessee General Assembly's acts—has placed some issues beyond the reach of the democratic process.  First among them is the freedom of speech.  If Tennessee wishes to exercise its police power in restricting speech it considers obscene, it must do so within the constraints and framework of the United States Constitution.  The Court finds that, as it stands, the record here suggests that when the legislature passed this Statute, it missed the mark.

For the reasons above, the Court **GRANTS** Plaintiff's motion for a Temporary Restraining Order prohibiting Governor Bill Lee, Attorney General Jonathan Skrmetti, and Shelby County District Attorney Steven Mulroy from enforcing Tenn. Code Ann. § 7-51-1407. This Order shall expire fourteen (14) days from the date of entry noted below, unless within such time, the Court extends the Order for an additional period under Federal Rule of Civil Procedure 65(b)(2).  The Court will hold a status conference in the coming days with the Parties to schedule future hearings.

**SO ORDERED**, this 31st day of March, 2023.

    s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE