UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE

------------------------------------------------------------------ X
FRIENDS OF GEORGE'S, INC.,

                           Plaintiff,
        -against-                          Case No. 2:23-cv-02163-TLP-tmp

STATE OF TENNESSEE, BILL LEE, in his official and
individual capacity as governor of Tennessee,
JONATHAN SKRMETTI, in his official and individual
capacity as the Attorney General of Tennessee, and
STEVEN J. MULROY, in his official and individual
capacity as District Attorney General of Shelby County,
Tennessee,

                          Defendants.
------------------------------------------------------------------ X

## BRIEF OF *AMICUS CURIAE* ACTORS' EQUITY ASSOCIATION IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

                                                  Megan Stater Shaw*
                                                  NY Bar #5877568
                                                  COHEN, WEISS AND SIMON LLP
                                                  900 Third Avenue, Suite 2100
                                                  New York, NY 10022
                                                  Telephone: (212) 356-0205
                                                  MShaw@cwsny.com
                                                  *Admission *pro hac vice* forthcoming

                                                  Samuel Morris
                                                  TN Bar #12506
                                                  GODWIN, MORRIS, LAURENZI &
                                                  BLOOMFIELD, P.C.
                                                  50 N. Front St., Suite 800
                                                  Memphis, TN 38103
                                                  Telephone: (901) 528-1702
                                                  smorris@gmlblaw.com

                                                  Attorneys for *Amicus Curiae*
                                                  Actors' Equity Association

**TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ................................................................................................... ii

STATEMENT OF INTEREST ................................................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................................... 1

ARGUMENT ........................................................................................................................... 4

I.    TENNESSEE'S STATUTE IS UNCONSTITUTIONALLY OVERBROAD AND VAGUE ................................................................................................................ 4

    A.    The Statute Applies to Protected, Non-Obscene Speech ....................... 4

    B.    States Cannot Ban Protected Speech Altogether to Shelter Children .................... 5

    C.    The Statute Applies to Speech Deemed "Harmful to Minors" Without Providing Further Guidance ................................................................. 6

II.    THE STATUTE DETERS LIVE THEATRICAL PRODUCTIONS PERFORMED BY EQUITY MEMBERS IN TENNESSEE ............................................ 7

    A.    The Controversial Live Theatrical Productions Performed by Equity Members are Indistinguishable from Drag Shows ................................................. 8

    B.    By Covering Equity Productions, the Statute will Chill Protected Speech in Tennessee. ................................................................................................... 10

    C.    A Chill on Live Theatrical Productions will have a Significant Economic Impact on the State of Tennessee ....................................................... 11

CONCLUSION ...................................................................................................................... 12

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ashcroft v. Free Speech Coalition*,
   535 U.S. 234 (2002) ............................................................................................................. 4, 5

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973) ................................................................................................................. 4

*City Council v. Taxpayers for Vincent*,
   466 U.S. 789 (1984) ................................................................................................................. 4

*Cohen v. California*,
   403 U.S. 15 (1971) ................................................................................................................... 4

*Erznoznik v. City of Jacksonville*,
   422 U.S. 205 (1975) ................................................................................................................. 5

*Ginsberg v. New York*,
   390 U.S. 629 (1968) ............................................................................................................. 6, 7

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018) ............................................................................................................... 6

*Kolender v. Lawson*,
   461 U.S. 352 (1983) ................................................................................................................. 4

*New York v. Ferber*,
   458 U.S. 747 (1982) ................................................................................................................. 4

*Reno v. American Civil Liberties Union*,
   521 U.S. 844 (1997) ......................................................................................................... 4, 6, 7

*Sable Comm's of Cal., Inc. v. F.C.C.*,
   492 U.S. 115 (1989) ................................................................................................................. 5

*Schad v. Borough of Mt. Ephraim*,
   452 U.S. 61 (1981) ................................................................................................................... 5

*Southeastern Promotions, Ltd. v. Conrad*,
   420 U.S. 546 (1975) ................................................................................................................. 9

**Constitutional Provisions**

U.S. CONST. amend. I ................................................................................................................ 1, 3, 4

**Statutes**

T.C.A. § 39-17-901(C) .................................................................................................................. 3, 6

**Other Authorities**

*2013 Grammy Winners*, RECORDING ACADEMY GRAMMY AWARDS,
   https://www.grammy.com/awards/56th-annual-grammy-awards (last visited
   Apr. 14, 2023) ........................................................................................................................... 2

Angele Latham, *Jackson Pride Organizer Expresses 'Joy,' Rep. Todd Calls a
   'Win' with Drag Show Ruling*, JACKSON SUN,
   https://www.jacksonsun.com/story/news/2022/10/07/jackson-pride-tn-2022-
   drag-show-age-18-and-older/69547945007/ ............................................................................ 2

*Everybody Say Yeah! Kinky Boots is Available for Licensing*, MTISHOWS.COM,
   https://www.mtishows.com/news/everybody-say-yeah-kinky-boots-is-
   available-for-licensing (last visited Apr. 14, 2023) .................................................................. 2

Family Research Council (@FRCdc), Twitter (Feb. 27, 2023 at 5:37 P.M.),
   https://twitter.com/FRCdc/status/1630336463538737155?cxt=HHwWhsC-
   2YWYj6AtAAAA ..................................................................................................................... 2

Jeff Lunden, *In the Broadway Musical '1776,' the Revolution is in the Casting*,
   NPR.ORG, https://www.npr.org/2022/10/15/1128740858/broadway-musical-
   1776-gender-race#:~:text=Roundabout%20Theatre%20Company-
   ,Elizabeth%20A.,as%20John%20Adams%20in%201776. (last visited Apr. 14,
   2023) ......................................................................................................................................... 9

*Kinky Boots*, TONY AWARDS,
   https://www.tonyawards.com/winners/year/any/category/any/show/kinky-
   boots/ (last visited Apr. 14, 2023) ............................................................................................. 2

Marc Hershberg, *Musicals make more Money on the Road than on Broadway*,
   FORBES.COM (Feb. 3, 2019),
   https://www.forbes.com/sites/marchershberg/2019/02/03/musicals-make-
   more-money-on-the-road-than-on-broadway/?sh=211799f8a111 .......................................... 11

Marybeth Hamilton, *SEX, The Drag, and 1920s Broadway*, 36 THE MIT PRESS
   82, 84 (1988) ............................................................................................................................. 9

Morning Call, *Don't say gay? Students say Bucks School District Killed Musical
   'Rent' Because it has Queer Relationships*, THE MORNING CALL (Apr. 19,
   2022 at 11:56 A.M.), https://www.mcall.com/2022/04/19/dont-say-gay-
   students-say-bucks-school-district-killed-production-of-musical-rent-because-
   it-has-queer-relationships/ ......................................................................................................... 9

Nancy Roberts Trott, *School District Anti-Gay Policy Splits N.H. Town*, LOS ANGELES TIMES (Mar. 17, 1996 at 12 A.M.), https://www.latimes.com/archives/la-xpm-1996-03-17-mn-47986-story.html. ........................ 8

Page Six Team, *'Kinky Boots' Walks Tall in Macy's After Parade Controversy*, PAGESIX.COM (Nov. 30, 2013), https://pagesix.com/2013/11/30/kinky-boots-walks-tall-in-macys-after-thanksgiving-parade-controversy/. / ............................................... 10

*'Rent' Controversy in Idaho: LGBT Content in Lake City Playhouse Musical Sparks Backlash*, HUFFPOST.COM (Dec. 23, 2011 at 1:36 P.M.), https://www.huffpost.com/entry/rent-controversy-in-idaho_n_1167896 ................................. 9

*The Economic Impact of Touring Broadway 2016-2017*, THE BROADWAY LEAGUE, https://www.broadwayleague.com/research/research-reports/ (Nov. 2019) ....................................................................................................................... 11

WILLIAM SHAKESPEARE, TWELFTH NIGHT, act 2, sc. 5, l. 97-101 .................................................. 8

**STATEMENT OF INTEREST**[1]

Actors' Equity Association ("Equity"), a labor organization that represents live theatrical actors and stage managers, is devoted to protecting live theatre as an essential component of a thriving civil society and the basis of its members' livelihoods. Since 1913, Equity has fought to win its members a dignified workplace at the theatre, from pay guarantees and pension and welfare benefits to the rules governing auditions. With more than 51,000 members across the nation, Equity is among the oldest and largest labor unions in the performing arts in America. Broadway tours of America's favorite musicals come to Tennessee each year, and over 380 Equity members reside in Tennessee, where they can perform in fifteen Equity-affiliated theatres. Preserving the First Amendment right to perform in uncensored, controversial works of art in the public sphere is essential to Equity's mission. It is in defense of this freedom, and for the reasons set out in this brief, that Equity now urges the Court to grant Plaintiff's motion for a preliminary injunction.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The audience's first introduction to Lola, a principal character in the hit Broadway musical *Kinky Boots*, is in an alleyway. Charles, the inheritor of a bankrupt family shoe business, chances upon an alleyway assault: a group of men hassling a woman in high-heeled shoes. The woman uses one of her shoes to knock one man unconscious before Charles can intervene. "He wasn't the first man to fall for me," she says, slipping out of her coat and breaking into song. This is Lola, a drag queen who performs with a retinue of Angels, all in

---

[1] No counsel for any party authored this brief in whole or in part or made a monetary contribution intended to fund its preparation or submission. All parties to this action have been asked to consent to the filing of this brief and all parties consent.

drag. She inspires Charles to revitalize his shoe factory by manufacturing high heels for her underserved niche.[2]

*Kinky Boots* is a heartwarming comedy that won six Tony Awards and a Grammy.[3] It also may be prohibited by Tennessee's recent enactment of Public Chapter No. 2, 113th General Assembly 2023 (the "Statute").

Shortly before its passage, the Statute's sponsor, Rep. Chris Todd of Madison County, sued to enjoin a drag show billed as a family-friendly event from performing in public and declared that drag shows are "child abuse." Angele Latham, *Jackson Pride Organizer Expresses 'Joy,' Rep. Todd Calls a 'Win' with Drag Show Ruling*, JACKSON SUN (Oct. 7, 2022 at 4:08 P.M.), https://www.jacksonsun.com/story/news/2022/10/07/jackson-pride-tn-2022-drag-show-age-18-and-older/69547945007/. In the wake of that lawsuit, Rep. Todd said that the purpose of the Statute was to "strengthen that law so that the DAs felt more empowered to pursue these cases" against drag shows. Family Research Council (@FRCdc), Twitter (Feb. 27, 2023 at 5:37 P.M.), https://twitter.com/FRCdc/status/1630336463538737155?cxt=HHwWhsC-2YWYj6AtAAAA (video interview of Rep. Todd retweeted by Rep. Todd, @RepChrisTodd).

The Statute prohibits performances of "adult cabaret entertainment"—performances deemed "harmful to minors" that feature "topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers"—on "public property"

---

[2] *See* libretto at pp. 16-20, available at *Everybody Say Yeah! Kinky Boots is Available for Licensing*, MTISHOWS.COM, https://www.mtishows.com/news/everybody-say-yeah-kinky-boots-is-available-for-licensing (last visited Apr. 14, 2023).

[3] *Winners / Kinky Boots*, TONY AWARDS, https://www.tonyawards.com/winners/year/any/category/any/show/kinky-boots/ (last visited Apr. 14, 2023); *2013 Grammy Winners*, RECORDING ACADEMY GRAMMY AWARDS, https://www.grammy.com/awards/56th-annual-grammy-awards (last visited Apr. 14, 2023).

2

or "[i]n a location where [it] could be viewed by a person who is not an adult."  ECF No. 19-1 at PageID 93.  "Harmful to minors" means "that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse when the matter or performance: (A) would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors; (B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and (C) Taken as [a] whole lacks serious literary, artistic, political or scientific values for minors."  T.C.A. § 39-17-901(6).  Violations of the Statute incur criminal penalties.  ECF No. 19-1 at PageID 94.

Equity submits this brief because it fears that the Statute could be read to prohibit a wide swathe of live theatre performances protected by the First Amendment.  If that is not the case, then Equity cannot determine what conduct the Statute prohibits.  From Euripides' *Bacchae* to *Mrs. Doubtfire*, theatrical productions frequently take on the attributes of a drag show.  Even if a script does not require it, directors may take creative license to change the gender presentation of any role.  As a result, Equity members cast in potentially affected roles are left with a Hobson's choice:  perform in Tennessee and risk criminal sanctions or decline to perform and breach their contract with the producer.  These unacceptable possibilities hinder Equity's ability to adequately advise its members and will chill protected, theatrical expression in Tennessee.

Equity contends that the Statute is unconstitutionally overbroad and vague, covers a wide range of live theatrical performances in which Equity members perform, and will deter the expression of protected speech in Tennessee.  For these reasons, Equity argues that this Court should grant Plaintiff's motion for a preliminary injunction.

**ARGUMENT**

I.   **TENNESSEE'S STATUTE IS UNCONSTITUTIONALLY OVERBROAD AND VAGUE**

The First Amendment shelters the American people from overbroad laws that prohibit a substantial amount of protected expression and vague laws that fail to give adequate notice concerning the conduct they proscribe. *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973); *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). A statute is unconstitutionally overbroad if there is "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court[.]" *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). A statute is unconstitutionally vague if it ties criminal culpability to enforcement standards that fail to communicate what, specifically, they prohibit. *E.g.*, *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871-74 (1997).

Equity submits that the Statute bans an entire category of protected expression, live theater featuring "male or female impersonators," and fails to give adequately specific guidance regarding what kinds of material are "harmful to minors." This overbreadth and vagueness will only deter Equity members from performing in Tennessee.

A.   **The Statute Applies to Protected, Non-Obscene Speech**

The First Amendment protects Americans' right to see, speak, read, and hear what they want. If offended, one may "simply . . . avert[] their eyes." *Cohen v. California*, 403 U.S. 15, 21 (1971). There are limits—defamation, threats, obscenity, child pornography—but those limits are tightly constrained. *Compare New York v. Ferber*, 458 U.S. 747 (1982) (holding that child pornography is unprotected speech), *with Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) (protecting simulated child pornography). In *Miller v. California*, the Supreme Court defined obscenity as speech which (1) the average person, applying contemporary community

4

standards, would find, taken as a whole, appeals to the prurient interest, (2) depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (3) lacks serious literary, artistic, political, or scientific value as a whole. 413 U.S. 15, 24 (1973). In other words, Americans have a constitutional right to view and express sexually charged or explicit entertainment, so long as it is not constitutionally obscene. *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61 (1981) (invalidating total ban on nude dancing).

The Statute, by its terms, captures protected speech. It prohibits certain types of expression if "harmful to minors." Although at first glance the Tennessee Code's definition of "harmful to minors" appears to mirror the *Miller* test for obscenity, it does not. Each of its prongs reach beyond that narrow definition to capture speech which may not be prurient to adults, patently offensive for adults, or lack objective and serious literary, artistic, political, or scientific value.

### B. States Cannot Ban Protected Speech Altogether to Shelter Children

States may only restrict minors' access to protected speech "in relatively narrow and well-defined circumstances[.]" *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975) (invalidating ordinance that prohibited drive-in theaters from showing films containing nudity when their screens were visible from a public place). This power cannot be used to totally eliminate expression appropriate for adults just because children might see or hear it. *Ashcroft*, 535 U.S. at 252; *Sable Comm's of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 131 (1989) (disallowing a ban on "dial-a-porn" messages that improperly "limit[ed] the content of adult telephone conversations to that which is suitable for children to hear").

The Statute prohibits adult cabaret entertainment from locations where adult cabaret entertainment "could be viewed" by a minor. This is an overbroad ban of protected speech or, at the very least, hopelessly vague. If you understand the word "could" to mean "is

5

legally permitted", the Statute is meaningless. Under that interpretation, the Statute prohibits adult cabaret entertainment in locations where adult cabaret entertainment is "legally permitted to be viewed" by minors, which is a contradiction. On the other hand, if the word "could" means "is possible," then the Statute is overbroad. It is possible for minors, most especially teenagers, to go anywhere, regardless of whether they are authorized to do so by their parents, the Tennessee General Assembly, or the proprietor of a theater which hosts Broadway shows. This reading results effectively in a total ban of all covered "adult cabaret entertainment" in Tennessee, which is unconstitutionally overbroad. Any alternative reading would require this Court to rewrite that entire clause in the Statute, which is outside the bounds of what the constitutional avoidance canon permits. *Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) (Alito, J.) ("a court relying on [the constitutional-avoidance] canon still must *interpret* the statute, not rewrite it") (emphasis in original).

> **C.    The Statute Applies to Speech Deemed "Harmful to Minors" Without Providing Further Guidance**

A statute can be vague even if it uses language similar, but not identical, to a legal term of art. In *Reno*, the Supreme Court found that the statute at issue was unconstitutionally vague because it adopted only one prong of the *Miller* test for obscenity ("depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law") and deleted the constraining element of that prong ("specifically defined by the applicable state law"). 521 U.S. at 872-74.

The Statute prohibits protected speech deemed "harmful to minors" as defined by T.C.A. § 39-17-901(6). As discussed above, the definition of "harmful to minors" does not track *Miller*'s definition of obscenity. *See* Section I(A). Although it appears to more closely resemble the statute in *Ginsberg v. New York*, 390 U.S. 629 (1968), which prohibited the sale of nude or

6

sexually explicit pictures and magazines to minors, it extends beyond what *Ginsberg* allowed. *Ginsberg*'s statute only regulated "knowing[]" sales to minors, *id.* at 643, not conduct which minors chanced upon or "could" figure out how to view. Likewise, the statute did not prevent parents from purchasing the explicit materials themselves for their children, while the Statute here provides no such carve-out. *Id*. at 639.

Here, the concept that materials may be "harmful to minors," as incorporated into the Statute, has no limiting principle. As in *Reno*, the second prong of the definition of "harmful to minors" is not cabined to conduct "specifically defined by state law," nor does the Statute identify prohibited conduct more specifically than all performances featuring "male or female impersonators" in any location in the State. Moreover, even though the definition of "harmful to minors" is limited to works with "serious" value for minors, the public statements of the Statute's sponsor, Rep. Todd, suggest that no performances involving "male or female impersonators" could have serious value for minors.

Equity can only conclude that the Statute amounts to a total ban on all performances in Tennessee featuring "male or female impersonators," with no guidance as to which of these performances may have serious value for minors. This makes the Statute unconstitutionally vague and implicates a host of Equity productions performed in Tennessee. *See infra* Section II(C).

## II.   THE STATUTE DETERS LIVE THEATRICAL PRODUCTIONS PERFORMED BY EQUITY MEMBERS IN TENNESSEE

The Statute's overbreadth and vagueness will have a direct impact on all actors, including Equity members, in Tennessee. Equity submits that live theatre has a long history of controversial and sometimes risqué gender-bending which is impossible to distinguish from the drag shows that the Legislature evidently intended to target with the Statute. Because of this,

7

Equity cannot advise its members to perform in Tennessee if the Statute goes into effect, a result with significant economic consequences for the local economy.

### A. The Controversial Live Theatrical Productions Performed by Equity Members are Indistinguishable from Drag Shows

The Complaint refers to Shakespeare's use of male actors in drag playing female roles. Compl. ¶ 10 (ECF No. 1 at PageID 3). Yet the use of "male or female impersonators" in Shakespearean drama is not just a historical accident, but a theme throughout his oeuvre. Seven of Shakespeare's 37 extant plays involve gender-bending as a plot point. In *Twelfth Night*, Viola disguises herself as Cesario, with whom the Countess Olivia promptly falls in love. Similarly, in *As You Like It*, Rosalind flees to the Forest of Arden disguised as Ganymede, with whom the shepherdess Phoebe falls in love. Gender-switching plays a role in *Cymbeline*, one of Shakespeare's last plays, and Act 4, scene 2 of *The Merry Wives of Windsor* features a memorable Falstaff in drag. Of course, the Government may argue that all Shakespearean works have serious literary or artistic value for minors. One wonders, given that phrase's vagueness. A school in New Hampshire withdrew *Twelfth Night* from instruction for "portraying homosexuality" in 1996.[4] And Shakespeare loved bawdy jokes. *See* WILLIAM SHAKESPEARE, TWELFTH NIGHT, act 2, sc. 5, l. 97-101.

Shakespeare aside, musical theatre is full of gender-nonconforming roles. *Kinky Boots*, *supra* pp. 3-4, features a drag queen. The musical *Priscilla, Queen of the Desert* is a story about two drag queens and a trans woman who perform a drag show in the Australian Outback. Edna Turnblad, Tracy's mother in *Hairspray*, is a drag role, as is the journalist Mary Sunshine in

---

[4] Nancy Roberts Trott, *School District Anti-Gay Policy Splits N.H. Town*, LOS ANGELES TIMES (Mar. 17, 1996 at 12 A.M.), https://www.latimes.com/archives/la-xpm-1996-03-17-mn-47986-story.html.

*Chicago*, Mrs. Doubtfire in *Mrs. Doubtfire*, and Ms. Trunchbull in *Matilda*. Peter Pan is, traditionally, a "trousers role" (where a woman dresses as a man). Directors also choose to cast men as women, or vice versa, based on their creative vision for a particular production. In 2022, the producers of *1776* cast women for all of its Founding Father roles.[5] Each of these productions feature sets, costumes, dance, and song difficult to distinguish from the sets, costumes, dance, and song of a drag show. Two of these examples, *Kinky Boots* and *Priscilla, Queen of the Desert*, feature drag show performers as part of their story.

        Just as a drag show and a musical featuring drag roles are formally indistinguishable, live theatre is no stranger to controversy. Mae West never premiered *The Drag* in New York after the police charged her with public obscenity in 1927. Marybeth Hamilton, *SEX, The Drag, and 1920s Broadway*, 36 THE MIT PRESS 82, 84 (1988). Closer to home, Chattanooga municipal officials banned the rock musical *Hair*, which features one drag role, from its public theater in 1971, a decision which the Supreme Court invalidated. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975). More recently, the public backlash to children seeing *Rent* is well-documented[6] and, in 2013, critics on Twitter of the

---

[5] Jeff Lunden, *In the Broadway Musical '1776,' the Revolution is in the Casting*, NPR.ORG, https://www.npr.org/2022/10/15/1128740858/broadway-musical-1776-gender-race#:~:text=Roundabout%20Theatre%20Company-,Elizabeth%20A.,as%20John%20Adams%20in%201776. (last visited Apr. 14, 2023).

[6] *Compare 'Rent' Controversy in Idaho: LGBT Content in Lake City Playhouse Musical Sparks Backlash*, HUFFPOST.COM (Dec. 23, 2011 at 1:36 P.M.), https://www.huffpost.com/entry/rent-controversy-in-idaho_n_1167896; Morning Call, *Don't say gay? Students say Bucks School District Killed Musical 'Rent' Because it has Queer Relationships*, THE MORNING CALL (Apr. 19, 2022 at 11:56 A.M.), https://www.mcall.com/2022/04/19/dont-say-gay-students-say-bucks-school-district-killed-production-of-musical-rent-because-it-has-queer-relationships/.

Macy's Thanksgiving Day Parade went viral, lambasting it for featuring a set piece from *Kinky Boots*.[7]

In sum, many live theatre productions feature "male or female impersonators," essentially similar to drag shows, and there are commentators aplenty who accuse theater productions of being "harmful to minors." Given the Statute's overbreadth and vagueness, Equity has reason to fear that many of the productions listed above, if not all, would fall within the Statute's scope.

### B. By Covering Equity Productions, the Statute will Chill Protected Speech in Tennessee.

There are currently fifteen theatres in Tennessee that employ Equity members. Additional theaters may play shows that hire Equity members via what Equity terms its guest artist contract. Since the Statute's passage, Equity has received many inquiries from members about "what to do" if cast in a Tennessee production that features gender-nonconforming or drag roles.

In the face of this overbroad and vague statute, Equity members face a Hobson's choice. If a member has already accepted an affected role in Tennessee, Equity is forced to advise them to either work and risk criminal prosecution or not work and risk a producer's breach of contract claim. The only alternative is for Equity's members to decline gender-nonconforming or drag roles in Tennessee altogether. This will chill protected theatrical expression in the state.

---

[7] Page Six Team, *'Kinky Boots' Walks Tall in Macy's After Parade Controversy*, PAGESIX.COM (Nov. 30, 2013), https://pagesix.com/2013/11/30/kinky-boots-walks-tall-in-macys-after-thanksgiving-parade-controversy/.

### C. A Chill on Live Theatrical Productions will have a Significant Economic Impact on the State of Tennessee

Broadway tours are a boon for local economies. In one week in 2019, the musical *Dear Evan Hansen* played at the Paramount Theatre in Seattle for seven performances and net nearly $1.5 million in ticket sales, the musical *Waitress* made over $1.4 million in Texas, *Miss Saigon* made nearly $1.5 million in North Carolina, and *The Phantom of the Opera* made nearly $1.4 million in Detroit.[8] The Broadway League's 2019 report for the 2016-2017 touring season found that "[o]n average, Broadway tours contributed an economic impact of 3.27 times the gross ticket sales to the economy of the metropolitan areas in which they played."[9] By this rough calculus, those shows introduced over $4.5 million dollars into each place in a single week.

At least three Broadway tours featuring cross-gendered casting or drag roles intend to visit Tennessee in the next year: *1776*, *Mean Girls*, and *Mrs. Doubtfire*. In the last ten years alone, there have been at least sixteen theatrical productions in Tennessee casting Equity members that portrayed gender non-conforming characters or portrayals of one gender by someone of a different gender:

*Cymbeline* (Nashville Shakespeare Festival, 2022)
*Rent* (Nashville Repertory Theater, 2022)
*Peter Pan: Wendy's Adventure to Neverland* (Nashville Children's Theatre, 2022)
*Twelfth Night* (Nashville Shakespeare Festival, 2021)
*Shakespeare in Love* (Nashville Repertory Theater, 2019; Playhouse on the Square, 2017)
*As You Like It* (Tennessee Shakespeare Company, 2018)
*Candide* (Clarence Brown Theatre Company, 2018)
*Bloody Bloody Andrew Jackson* (Nashville Repertory Theater, 2017)
*Priscilla, Queen of the Desert* (Playhouse on the Square, 2017)
*The 39 Steps* (Clarence Brown Theatre, 2015)

---

[8] Marc Hershberg, *Musicals make more Money on the Road than on Broadway*, FORBES.COM (Feb. 3, 2019), https://www.forbes.com/sites/marchershberg/2019/02/03/musicals-make-more-money-on-the-road-than-on-broadway/?sh=211799f8a111.

[9] *The Economic Impact of Touring Broadway 2016-2017*, THE BROADWAY LEAGUE, https://www.broadwayleague.com/research/research-reports/ (Nov. 2019).

*Rocky Horror Show* (Playhouse on the Square, 2015)
*Cabaret* (Nashville Repertory Theater, 2013)
*Peter Pan* (Playhouse on the Square, 2011)
*Hairspray* (Playhouse on the Square, 2010)
*Big River* (Studio Tenn Theatre Company, 2013)

Musicals featuring "male or female impersonators" are neither few nor far between in Tennessee. A chill on their performance would not only impact the civil liberties of actors in Tennessee but dampen a profitable sector of Tennessee's economy.

## CONCLUSION

The theater provides a venue for works of undoubted artistic and socially redeeming significance. Broadway performances depict the issues roiling contemporary society, from the acceptance of a drag queen in *Kinky Boots* to a young child's perspective of divorce in *Mrs. Doubtfire*. To protect the freedom of expression in Tennessee, this Court should refuse the Tennessee General Assembly's desire to prioritize one vision of the social good over many and grant the Plaintiff's motion for a preliminary injunction.

Dated: April 17, 2023

Respectfully submitted,

*/s/ Megan Stater Shaw\**
NY Bar #5877568
COHEN, WEISS AND SIMON LLP
900 Third Avenue, Suite 2100
New York, NY 10022
Telephone: (212) 356-0205
MShaw@cwsny.com
*Admission *pro hac vice* forthcoming

Samuel Morris
TN Bar #12506
GODWIN, MORRIS, LAURENZI &
BLOOMFIELD, P.C.
50 N. Front St., Suite 800
Memphis, TN 38103
Telephone: (901) 528-1702

Attorneys for Actors' Equity Association

12