IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| FRIENDS OF GEORGE'S, INC. | ) |
| | ) **Case No. 2:23-cv-02163-TLP-tmp** |
| PLAINTIFF, | ) |
| | ) |
| | ) |
| | ) **COMPLAINT FOR VIOLATIONS OF** |
| | ) **THE CIVIL RIGHTS ACT OF 1871, 42** |
| v. | ) **U.S.C. § 1983** |
| | ) |
| | ) |
| | ) |
| STEVEN J. MULROY, *in his individual* | |
| *and official capacity as District Attorney* | |
| *General of Shelby County, Tennessee,* | |
| | |
| DEFENDANT | |

## PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Plaintiff, Friends of George's, Inc., (hereinafter "Plaintiff"), by and through its undersigned

attorneys, and in supplement to Defendants' *Motion to Dismiss the State of Tennessee, Bill Lee,*

*and Jonathan Skrmetti, In Their Official and Individual Capacities, and Steven Mulroy, in His*

*Official Capacity* ("Motion to Dismiss"), states as follows:

As a result of the dismissal of the State of Tennessee, Governor Bill Lee in his individual

and official capacities, and Attorney General Jonathan Skrmetti in his individual and official

capacities, ECF 41 is now partially moot. Only Part I, the question of organizational standing,

raised by District Attorney General Steven J. Mulroy in his official capacity, is still in controversy.

Plaintiff therefore responds that it is a proper party to challenge Public Chapter No 2, 113th General

Assembly (2023) (the "Adult Entertainment Act" or "the Act") for at least three reasons. First,

Plaintiff has organizational standing because the organization itself is directly harmed by the statute. Second, Plaintiff has organizational standing as a representative of all of its members because the entirety of its membership is engaged directly in the performance or production of drag entertainment and is harmed by the statute. Finally, anyone, including Plaintiff, may challenge the Adult Entertainment Act, as the Supreme Court has made clear *anyone* may bring a First Amendment overbreadth and vagueness challenge where a statute's "very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965).

## INTRODUCTION

Plaintiff is a 501(c)(3) nonprofit organization based in Memphis, Tennessee.  Having recognized "the LGBTQ community's growing need for events and activities outside of bars and nightclubs," Plaintiff's mission is to promote drag performance art by "providing new entertainment alternatives with a focus on quality stage productions" which necessarily includes "male or female impersonators."[1]

Plaintiff has challenged the constitutionality of the Adult Entertainment Act  alleging that it is facially invalid because it is a content-based, viewpoint discriminatory, statute that does not meet the requirements of strict scrutiny. This statute is designed, uniquely, to criminalize and chill speech, including private speech in private, non-commercial locations, that was previously permissible under Tennessee law and has been deemed constitutionally protected in every Supreme Court case to address statutes with similar definitions for the past quarter century. The

---

[1] Plaintiff does not concede that "male and female impersonators" is a clearly defined term. "Impersonator" is completely undefined in the statute or in any cross-referenced statute. Plaintiff's performer members self-identify as "male or female impersonators."

statute fails not only to serve a compelling governmental interest but is also not narrowly tailored in any fashion.

Defendant's Motion to Dismiss puts the cart before the horse and argues that Plaintiff lacks organizational standing because it cannot prove that it or its members intend to violate the statute. However, Plaintiff's challenge to the Adult Entertainment Act is predicated on the fact that the Statute is so vague and overbroad, Plaintiff cannot know what precise conduct violates the Adult Entertainment Act, and that its terms are so subjective that no one can be clear on precisely what they mean, thereby creating a chilling effect and enforcement risks that infringe on protected speech. Defendant's reasoning is circular, arguing, in essence, that Plaintiff's standing turns on the Adult Entertainment Act's constitutionality. The standing question before the Court is not whether, under Defendant's preferred construction, Plaintiff will violate the statute. The questions before the Court are 1) whether Friends of George's, as an entity, is threatened with harm under the act, and 2) whether Friends of George's may represent its members interests and 3) whether the speech of the public at large is chilled by the statute. If any of the three questions is answered in the affirmative, then Plaintiff has standing. The answer to all three questions is a resounding "yes."

## ARGUMENT

The AEA rather insidiously builds a Frankenstein's monster from existing statutes to create an entirely new criminal offense under the guise of merely regulating adult-oriented entertainment. The AEA, which was originally intended to go into effect on April 1, 2023, adds a criminal provision to Tennessee's Adult-Oriented Establishments statute – Tenn. Code Ann. § 7-51-1407 – that makes it unlawful "for a person to perform adult cabaret entertainment: (a) on public property; or (b) In a location where the adult cabaret entertainment could be viewed by a person who is not an adult." ECF No. 19-1 (Adult Entertainment Act) at 93 (§ 2). It makes a violation of

this new portion of the statute a felony for a second offense, stripping individuals of fundamental rights and exposing them to up to six (6) years in prison. ECF No. 19-1. The new offense created by the Adult Entertainment Act does not use the definitions within the Adult-Oriented Business statute. Instead, the Act amends the definitions section, § 7-51-1401, to include a wholly new term, "adult cabaret entertainment." That definition is totally unique within the Adult-Oriented Business statute, because unlike any other part of that statute, it cross-references and borrows definitions from Tennessee's 1980 criminal obscenity statute, Tenn. Code Ann. §39-17-901. The definitions from Tennessee's 1980 criminal obscenity statute long-predate modern First Amendment law regarding the regulation of speech for the supposed protection of minors. These definitions were never used in regulating adult-oriented businesses or entertainers. They were only used in regulating the sale of indecent materials such as pornography magazines and videos to minors.

Instead of placing this new Statute in the typical place for criminal offenses, Title 39 of the Tennessee Code, the Act situates the offense in Title 7, under a section titled "Restrictions on Location of Adult-Oriented Businesses." Prior to the AEA, this section of Title 7 was a zoning law that contained no criminal penalties. It simply prohibited the location of an Adult-Oriented Business within 1,000 feet of "a childcare facility, a private, public, or charter school, a public park, family recreation center, a residence, or a place of worship," and contained a specific surveying method for measuring 1,000 feet. Should this legislation be permitted to go into effect, this zoning and licensure statute will be a Trojan horse for the criminalization of protected First Amendment speech.

Despite Defendant's argument that this statute is essentially a modification of an existing law, the AEA actually creates a new felony offense, where none previously existed, by adding a sweepingly broad amendment to the Adult-Oriented Establishment statute, and then hybridizing it

with a 1980 statute regulating the sale and in-store display of indecent material like magazines and videos to minors.  Read in its natural order, it becomes clear that this statute is a bizarre attempt to create a wholly new criminal offense using "obscene for minors" definitions. The relevant definitions taken from Tennessee's existing criminal obscenity statute, Tenn. Code Ann. § 39-17-901, are as follows:[2]

**T.C.A. § 7-51-1407 (The new criminal offense)**

(c)(1) It is an offense for a person to perform adult cabaret entertainment:

(A) On public property; or

(B) In a location where the adult cabaret entertainment could be viewed by a person who is not an adult.

(3) A first offense for a violation of subdivision (c)(1) is a Class A misdemeanor, and a second or subsequent such offense is a Class E felony.

**T.C.A. § 7-51-1401  (The new definition included in the offense itself)**

(3) "Adult cabaret entertainment"

(A) Means adult-oriented performances that are harmful to minors, as that term is defined in § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers; and

(B) Includes a single performance or multiple performances by an entertainer;

**T.C.A. § 39-17-901 (The old definitions for regulating the sale of indecent materials)**

(6) "Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse when the matter or performance:

---

[2] In order to make the statutory scheme clear, the statues below are presented in the order in which one would read them if one began with the criminal offense and penalty and then reviewed the definitions of the terms, beginning from the broadest definitions to the most granular and omitting any definitions not material to the cross-referenced definition of "harmful to minors."

Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors;

Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and

Taken as whole lacks serious literary, artistic, political or scientific values for minors;

(4) "Excess violence" means the depiction of acts of violence in such a graphic or bloody manner as to exceed common limits of custom and candor, or in such a manner that it is apparent that the predominant appeal of the material is portrayal of violence for violence's sake;

. . .

(8) "Minor" means any person who has not reached eighteen (18) years of age and is not emancipated;

(9) "Nudity" means the showing of the human male or female genitals, pubic area, or buttocks with less than a fully opaque covering or the showing of the female breast with less than a fully opaque covering of any portion below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state;

(11) "Patently offensive" means that which goes substantially beyond customary limits of candor in describing or representing such matters;

(12) "Prurient interest" means a shameful or morbid interest in sex;

(13) "Sadomasochistic abuse" means flagellation or torture or physical restraint by or upon a person for the purpose of sexual gratification of either person;

(14) "Sexual conduct" means:

(A) Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated. A sexual act is simulated when it depicts explicit sexual activity that gives the appearance of ultimate sexual acts, anal, oral or genital. "Ultimate sexual acts" means sexual intercourse, anal or otherwise, fellatio, cunnilingus or sodomy; or

(B) Patently offensive representations or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals; and

(15) "Sexual excitement" means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

All of the cross-referenced definitions are for terms contained only in Tenn. Code Ann. § 39-17-911, titled "Sale, loan or exhibition of material to minors," which merely prohibits the sale of indecent material to minors and places simple restrictions on how businesses like bookstores and newsstands display indecent magazines, movies, and the like, for sale or rent. It is focused exclusively on restrictions such as placing them behind the counter or displaying them in binder racks that obscure the cover or in opaque plastic at least 5'6" above floor height. The violation of this statute is a Class A misdemeanor, and it is an affirmative defense that the minor was accompanied by a parent or guardian who gave consent.

The AEAAEA attempts to bury a felony offense directed at individual people in an administrative statute regulating the location and operation of adult-oriented businesses. It imports definitions from an antiquated obscenity law governing the sale and display of, *inter alia*, adult magazines in bookstores, and then it purports to be merely a time, place, and manner restriction. Thus, Plaintiffs challenge is to a wholly new felony offense, filled with definitions substantially similar to those invalidated in *Ashcroft v. ACLU,* 542 U.S. 656 (2002). *see also: Ashcroft v. Free Speech Coalition,* 535 U.S. 234 (2002) (striking down as vague and overbroad definitions of "simulated child pornography" in the Child Pornography Prevention Act); *Reno v. ACLU*, 521 U.S. 844 (1997) (striking down provisions of the Communications Decency Act).

For the reasons that follow, Plaintiffs have standing to challenge this new criminalization of conduct that is so broadly defined and vague that it could easily encompass even mildly risqué theatrical performances by "male and female impersonators," including the PG-13 to R-rated comedic performances written and performed by Plaintiffs.

I.    **Plaintiff has organizational standing because it is, itself, a "person" as that term is commonly used and is directly harmed by the statute.**

Plaintiff has organizational standing because the entity itself, as a 501(c)(3) performing and promoting the art of drag entertainment, is harmed by the statute. Defendant, taking a position that is baffling at best, touches briefly on the case that actually sets forth the standard for a corporation to have standing to bring suit, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). Rather than engage with the case, Defendant asserts without basis that Plaintiff has not alleged standing in its own right. *Havens Realty* held that an organization engaged in promoting equal housing alleged an injury for two reasons, 1) its organizational purpose was frustrated by the defendant's violation of the Fair Housing Act and because 2) Havens Realty's violation of the Fair Housing Act resulted in a drain on its resources. *Id.* at 366.

In making the assertion that *Havens Realty* does not apply, Defendant states that Plaintiff asserted no harm to itself as an entity, ignoring Plaintiff's Complaint and the portion of Plaintiff's TRO argument that addressed Plaintiff's independent standing. The allegations contained in Plaintiff's operative Complaint against DAG Mulroy at ECF-1, PageID 13-14, ¶¶ 62-73 allege that their shows would become subject to a previously unnecessary age restriction, that ticket sales would be impacted, and that shows might even need to be cancelled. (This Court also found as much in the TRO order. ECF-26, PageID 181-182.) Additionally, Plaintiff asserted at the TRO hearing that:

> [Friends of George's] consists of performers and the production crew of drag shows, that is to say, male and female impersonators. Their performances, or performances that they might wish to put on, are due to their status as male and female impersonators, either intrinsically criminalized by the statute under one reading or subjected to far broader regulation and enhanced punishments under another reading of the statute.

Finally, as discussed below, the manner in which the statute operates would criminalize *mere participation* in a performance, meaning that even if the Government's interpretation of "harmful to minors" were accurate (it is not), the Act criminalizes performances "taken as a whole" and that "feature" the proscribed classes of persons. Tenn. Code Ann. § 39-17-901; Id. § 7-51-1407. Thus, the entire performing troupe could be penalized even if only one individual violated the Act.

Only in a truly contorted view of "injury" or "harm to a theater company could one argue that the company itself would not suffer if the on-stage, in-character acts of the performers are criminalized. Imagine *Romeo and Juliet* if § 39-17-901's prohibition on depictions of excessive violence were used to prohibit a performance showing a fourteen (14) year-old minor child stabbing herself in the heart.[3] The final scene would have to be omitted if a school wished to perform Shakespeare. Such a prohibition would clearly damage the performance, the company, and the author's work.

Plaintiff is a 501(c)(3) nonprofit corporation organized under the laws of the State of Tennessee. It is a performing theater troupe and production company that writes its own comedic plays for performance to audiences without age restriction with the specific, stated mission of meeting the "LGBTQ community's need for events and activities outside of bars and nightclubs" with "a focus on quality stage productions." Though the Tennessee General Assembly may not recognize it, the "male and female impersonators" of today are entitled to the First Amendment protections that Shakespeare's theatre company, Lord Chamberlain's Men, and its female impersonators were not when they performed bawdy plays, often considered inappropriate for

---

[3] William Shakespeare, *Romeo and Juliet*, Act 5, Scene 3 (1597) ("O, happy dagger, this is thy sheath. There rust and let me die.").

women and children. And while the Lord Chamberlain's Men had to rely on the grace of Tudor monarchs, Friends of George's may invoke the First Amendment in its own right when censorship threatens its productions.[4]

**II.** **Plaintiff has organizational standing because all of its members are engaged directly in the performance or production of drag entertainment and are harmed by the statute.**

Finally, an organization also has standing to sue on behalf of its members "when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 9 (1988).

Here, Plaintiff's members are, as noted above, male and female impersonators whose speech is burdened by an unconstitutional felony criminal statute with few (if any) exceptions for location. Plaintiff's purpose is to put on drag theater performances, the content of which is restricted by the Adult Entertainment Act's unconstitutional overbreadth, and the organization is situated to collectively litigate the issue just as easily as, say, an individual performer within the group bringing suit in the form of a class action.

Defendant again relies on a fast-and-loose quotation out of context to avoid addressing the merits. Defendant alleges that Plaintiff must point to a specific member of the organization that will suffer harm to meet the first prong of this analysis. For this proposition, Defendant quotes (without including a pin cite), *Ass'n of Am. Physicians*, 13 F.4th at 543 (6th Cir. 2021). Defendant's "quotation" relies heavily on omission and reads:

> Plaintiff "must do more than identify a likelihood that" one of the defendants "will harm an unknown member"; the organization must actually "identify a

---

[4] British Library, *Treasures in Full, Shakespeare in Quarto*, § 2 "Lord Chamberlain's Men" https://www.bl.uk/treasures/shakespeare/companies.html

member who has suffered (or is about to suffer) a concrete and particularized injury from [at least one of] the defendant[s'] conduct."

The actual quotation reads: ". . .will harm an unknown member **in light of the organization's extensive size or membership base**." *Ass'n of Am. Physicians*, 13 F.4th 531 at 543 (emphasis added). The Court went on to say that "The organization must instead identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct. *Id.* As an initial matter, *all* of Plaintiff's members will suffer an injury because their ability to write and perform their material will be unconstitutionally constrained.

Even though Plaintiff has alleged that the anonymity of its members requires protection at this stage of the proceedings (an assertion borne out by disturbing contacts from an extremist organization with a history of armed protest of drag events and death threats directed at Plaintiff's counsel since the Court's Temporary Restraining Order), nothing in *Ass'n of Am. Physicians* specifies that the individual members who would be harmed must be identified in the Complaint by name, because that is simply not what the case is about.

*Ass'n of Am. Physicians* is concerned about whether the complaint alleges *plausible* standing allegations consistent with the *Twombly/Iqbal* pleading standard. *Id.* at 543. In that case, the fact that the identified individuals were referred to by pseudonyms was not the issue. The failure that resulted in a lack of standing was that they had not alleged a plausible injury. *Id* at 544.

The organization in that case alleged that the FDA authorized the use a federal stockpile of Hydroxychloroquine during the COVID-19 pandemic to ensure its access to patients who required it for on-label use but that restricted the use of the stockpile for off-label COVID-19 treatment. The complaint alleged that the doctors *might* not be able to prescribe it to their patients for this purpose, and that a hypothetical threat of discipline by their state medical board should they do so constituted an injury sufficient for organizational standing. *Id.* The Court held that organizational

standing was not doomed by the lack of a named individual; rather, it was doomed by the lack of an allegation of *any* likely harm. *Id.* at 545. Specifically, the Court noted that the potential unavailability of a drug to *patients* did not constitute a harm to *physicians*, but it decided the issue on the basis that the complaint did not allege the drug was unavailable to patients or physicians but instead alleged that it was "easy to manufacture" and that "it is feasible for manufacturers to produce a million new doses daily," also calling it "in plentiful supply."

Plaintiff's allegation that a member would be harmed must be *plausible*, and in an organization comprised entirely of drag performers and the crew that supports their performances, it would be *implausible* that members' speech would not be constrained and/or chilled by a statute that expressly limits protected speech by "male and female impersonators."[5]

Defendant's effort to cherry pick a few words from an inapposite case's dicta to string together a fabricated holding is creative, as is their effort to do the same with Plaintiff's Counsel's TRO argument while ignoring the Complaint itself. These positions, however, are as fictional as Friends of George's scripts and merely impersonate the law rather than citing it. That Defendant must resort to these methods demonstrates the absolute lack of actual law to support their positions, and this Court should reject them and allow the case to proceed to trial.

III. **Defendant misstates the legal standard to establish standing in First Amendment overbreadth and vagueness challenges and anyone whose speech is actually chilled, including Plaintiff, may challenge the Adult Entertainment Act.**

It is a settled principle of law that "statutes attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a considered legislative

---

[5] Notwithstanding Plaintiff's safety concerns, Plaintiff has consulted with Defendant regarding a protective order to safely identify the members by name, and Defendant has already taken the 30(b)(6) deposition of Vanessa Rodley, a member whose speech would be restricted and chilled by this statute.

judgment that a particular mode of expression has to give way to other compelling needs of society." *Broadrick v. Okla.*, 413 U.S. 601, 611-612 (1973) (citing *Herndon* v. *Lowry*, 301 U.S. 242, 258 (1937); *Shelton* v. *Tucker*, 364 U.S. 479, 488 (1960); *Grayned* v. *City of Rockford*, 408 U.S., at 116-117.)  The Supreme Court has also altered its traditional rules of standing to permit "attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity" in cases regulating speech. *Id.* (quoting *Dombrowski* v. *Pfister*, 380 U.S. 479, 486 (1965)). In such cases, Plaintiff's may bring such challenges based on "a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.*

Such challenges are specifically permitted in cases regulating expression, both in the form of spoken words and other forms of expression. *Gooding* v. *Wilson*, 405 U.S. 518, 520 (1972). [6] These challenges have "also been entertained where statutes, by their terms, purport to regulate the time, place, and manner of expressive or communicative conduct." *Broadrick v. Okla.*, 413 U.S. at 613. In the Sixth Circuit, Courts analyzing overbreadth standing determines whether the regulation reaches a substantial amount of constitutionally protected conduct. *Leonardson v. City of East Lansing,* 896 F.2d 190, 195 (1990).

Plaintiff does not dispute that one, single, potential, impermissible application of a statute is insufficient to bring a statute under the overbreadth doctrine, but Plaintiff's speech and that of other similar performers will be substantially burdened by the statute's vagueness and overbreadth.

---

[6] See also *Cohen* v. *California*, 403 U.S. 15 (1971); *Street* v. *New York*, 394 U.S. 576 (1969); *Brandenburg* v. *Ohio*, 395 U.S. 444 (1969); *Chaplinsky* v. *New Hampshire*, 315 U.S. 568 (1942). *Broadrick v. Okla.*, 413 U.S. 601, 612, (1973); *Reno v. ACLU*, 521 U.S. 844 (1997); *Ashcroft v. ACLU*, 542 U.S. 656 (2002); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002).

*Id*.  Overbreadth standing questions necessitate an overbreadth analysis. "The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). The primary question in the overbreadth analysis is whether the *type* of speech the Act regulates "falls within the First Amendment's vast and privileged sphere." *Id.* "The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft*, 535 U.S. at 255. "[I]t is important to ensure that legitimate speech is not chilled or punished." *Ashcroft,* 542 U.S. at 666. (Affirming the Third Circuit's determination that a preliminary injunction barring implementation of the Child Online Protection Act ("COPA") was not narrowly tailored.)

The Supreme Court upheld *Ashcroft* on the basis that the statute was not narrowly tailored. But on remand, the Third Circuit applied a detailed overbreadth analysis to the definition of "harmful to minors" used in COPA and found the statutory definitions both overbroad and not narrowly tailored. *ACLU v. Mukasey,* 534 F.3d 181 (3d Cir., 2008) (*Ashcroft* on remand to the 3d Cir.). The definition of "harmful to minors" used in COPA is substantially similar (indeed nearly identical) to the statutory definitions found at § 39-17-901. *Ashcroft,* 542 U.S. at 661-62.

In COPA, material that is "harmful to minors" is defined as:

"any communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind that is obscene or that—

"(A) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;

"(B) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and

14

"(C) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors." § 231(e)(6).

"Minor[s]" are defined as "any person under 17 years of age." § 231(e)(7).

*Id.*

Compare this to the definitions employed by the Adult Entertainment Act:

(6) "Harmful to minors" means that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse when the matter or performance:

(A) Would be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors;
(B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and

(C) Taken as whole lacks serious literary, artistic, political or scientific values for minors;

Tenn. Code Ann. § 39-17-901.

As these definitions of "harmful to minors" are substantially similar, the Third Circuit's detailed analysis in *Mukasey* is highly instructive. The *Mukasey* Court held that COPA was overbroad in part simply because of its definition of "minor." The Adult Entertainment Act defines "minor" as any person under the age of 18. COPA defined it as any person under the age of 17. *Mukasey,* F.3d at 662. found that COPA's definition of "material harmful to minors" The Third Circuit held that these definitions were overbroad because they "impermissibly places at risk a wide spectrum of speech that is constitutionally protected. . . . " *Id.* at 206. "COPA's definition of 'minors' renders the statute overinclusive because it 'broadens the reach of 'material that is harmful to minors' under the statute to encompass a vast array of speech that is clearly protected for adults -- and indeed, may not be obscene as to older minors.'" *Id.* Applying its prior reasoning from *Ashcroft*, the Third Circuit noted that this definition of "minor" causes the statute to "appl[y] in a literal sense to an infant, a five-year old, or a person just shy of age seventeen." *Id.* at 191.

The Court reasoned that the definition of "harmful to minors" predicated on community standards when coupled with the definition of "minor" itself rendered the statute impermissibly vague and overbroad because speech fit for a five-year-old is not the same as speech fit for a seventeen year old, finding that publishers "would be exposed to great uncertainty in deciding what minor could be exposed to its publication." *Id.* The reason is not that the definition of "minor" is not clear by itself, it is that "contemporary community standards" are not the same for the five-year-old and the seventeen-year-old. *Id.* The *Mukasey* Court expressly rejected the Government's reasoning that the statute should be read to apply "only to normal, older adolescents." *Id.* Likewise, in the case at bar, the sliding scale of what is "harmful to minors" slides too far and too readily. These are decisions best left to private citizens and parents, not a government intent on childproofing the world as though it were a nursery.

The Adult Entertainment Act applies to both commercial and noncommercial speech and applies to even a single performance. Tenn. Code. Ann. § 7-51-1401. This, too, runs afoul of the *Mukasey* reasoning. In passing COPA, Congress attempted to limit its regulation to commercial speech. *Id.* at 192. But the Third Circuit reasoned that the term "commercial" was overbroad because it would encompass even non-paid transactions that made up only a small portion of a publisher's work. *Id.* The Adult Entertainment Act *explicitly* encompasses uncompensated performances, and, worse, could subject performers who did not actually engage in the conduct that is "harmful to minors" to arrest and prosecution. The Adult Entertainment Act makes it "an offense for a person to perform adult cabaret entertainment," and "[a]dult cabaret entertainment . . . [m]eans adult-oriented performances that are harmful to minors, as that term is defined in § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers." It is clear from this language that the offense is *merely*

*participating* in a performance that features these entertainers. Tenn. Code Ann. § 7-51-1401 & 1407. And because the statute contains no *mens rea* requirement whatsoever, a person could be subject to prison for merely appearing in such a performance *even without the intent* to be in a stage play or musical performance that does violate the statute.

This is essentially the same reasoning that the *Mukasey* court used when finally invalidating COPA. *Id* at 181. COPA's requirement that in evaluating whether a publication "taken as a whole lacked serious literary, artistic, political or scientific value for minors" meant that an entire publication would be treated as violating COPA even if only a single exhibit crossed the line of what was "harmful to minors." The definitions used in the Adult Entertainment Act are the same. Something is "harmful to minors," "when the matter or performance . . . taken as a whole lacks serious literary, artistic, political or scientific value for minors."

In the context of a performance, that would mean that only a single performer in a single scene or song need violate the Act for the entire performance and all of its performers to have violated the act, a sort of felony murder doctrine for the stage.

The Defendant will likely argue the contrary, that the statute must be read to exclude performances that contain *any* literary, artistic, political, or scientific value for minors, but this is nonsensical. Recall, these definitions were originally only used in § 39-17-911, the portion of the statute regulating the sale and display of, *inter alia*, pornographic magazines to minors. Certainly, the legislature did not intend to exempt from age restrictions pornographic publications, like *Playboy* magazine*,* that also contain serious think pieces and political editorials.  Under that interpretation of the statute, a single performer who engaged in the most lascivious, overt, perverse sexual acts on stage in front of a child of thirteen could then completely cure the performance by

donning a lab coat and teaching the audience how to make a volcano for their science fair project.[7] Thus, "taken as a whole" must be read such that one act that is "harmful to minors" must criminalize the entire performance and everyone in it. The Act sweeps a vast array of protected speech within its ambit and therefore meets the first prong of the overbreadth standing rule.

The second prong of the analysis asks there is a credible possibility of enforcement against Plaintiff. The very first thing this Court should consider is that this statute is an entirely new felony criminal statute directed at a specific group of individuals. Nothing like it has existed, or has been enforceable, in Tennessee or any other state for decades. The chilling effect on Plaintiff's speech exists because this statute does not merely *potentially* regulate protected speech or expressive conduct in which a theater troupe would engage. It explicitly regulates a great mass of protected speech – specifically expressive conduct in which comedic theater companies like Plaintiff routinely engage.

Far from the minor expansion of an existing regulatory scheme that Defendants claim it to be, the statute is a wholly new felony offense aimed directly at "persons," which includes both organizations like Friends of George's and the individual performers who comprise Friends of George's. The only real limitation is what a given group of adults subjectively view as appropriate for minors, and the bill's sponsor made clear that it specifically targets any and all performances by drag troupes when he stated, "I think moving forward, we anticipate that any kind of consideration of a drag queen event be nonexistent. . . ."

---

[7] Though they could still be prosecuted for violating the fully content-neutral indecent exposure statute, though this would be only a Class B misdemeanor because the statute explicitly makes it less of a crime to actually masturbate in front of a child than the AEA does to simply "describe" it. Tenn. Code Ann. § 39-13-511.

The Supreme Court has already held invalid nearly identical regulations intended to protect minors that were far less ambiguous and not clearly targeted towards an individual group of speakers. *See Ashcroft v. ACLU,* 524 U.S. 656 (2004). Plaintiff has taken the position that it is not challenging the entire criminal obscenity statute on which the Adult Entertainment Act rests, but Plaintiff does challenge the definitions in Tenn. Code Ann. § 39-17-901 as facially unconstitutional when incorporated into § 7-51-1401 under the Adult Entertainment Act.[8] ECF 26, PageID 188.

Defendant argues that the Adult Entertainment Act merely slightly extends the time, place, and manner restrictions already included in the Adult-Oriented Business statute. It does nothing of the sort. When regulating sexually-oriented businesses like strip clubs to abate their secondary effects, such as drug dealing and prostitution, a lesser standard of scrutiny applies: (1) the law must be passed within the constitutional power of the government; (2) the law must further an important or substantial government interest; (3) the governmental interest must be unrelated to the suppression of free expression; and (4) the incidental restriction on the First Amendment freedoms must be no greater than is essential to the furtherance of that interest. *Entm't Prods., Inc. v. Shelby County*, 545 F. Supp. 2d 734, 739 (2008). In *Entm't Prods., Inc.* the Sixth Circuit addressed, *inter alia*, definitions found in Tenn. Code. Ann. 7-51-1401[9] using this intermediate scrutiny standard.

However, those standards hinged on the fact that the statute was regulating the secondary effects of strip clubs themselves, not the secondary effects of a seventeen-year-old overhearing a

---

[8] Plaintiff does not concede these definitions are constitutional at all. In fact, they are not, but Plaintiff does concede that it is not a purveyor of dirty magazines and therefore not the proper party to challenge § 39-17-911.
[9] The definition of "adult cabaret entertainment" was not among those the *Entm't Prod.* Court reviewed, because it was an entirely new addition created by the Adult Entertainment Act.

drag queen telling a sexually explicit joke.[10] Those definitions did not attempt to redefine obscenity as § 39-17-901 does. The statutory scheme reviewed in *Entm't Prod.* did not cross reference § 39-17-901 in any way at that time.

Tenn Code Ann. § 39-17-901 *et seq.* places an extremely limited regulation on speech by making it a Class A misdemeanor for commercial establishments to display media such as videos and magazines that are "harmful to minors" in a fashion that could be easily viewed by minors. *see* Tenn. Code Ann. § 39-17-901 (the only part of Tennessee's criminal code using the terms incorporated into Title 7 by the Adult Entertainment Act). The statutory language defining "harmful to minors" pre-dates *Reno* and *Ashcroft* and is far broader than the language that *Ashcroft* held unconstitutional. *Ashcroft*, 542 U.S. at 661.

Plaintiff thus challenges Title 39's previously unchallenged, forty-three-year-old definition of "harmful to minors" as unconstitutionally burdening their right to free expression, but Plaintiff does so *only* in the context of § 7-51-1401 and 1407. Plaintiff has no interest in altering the height of the shelves on which Playboy Magazine must be displayed at a bookstore. Plaintiff is challenging a new criminal statute that impedes their ability to function as a theater troupe, to write their scripts as they see fit, and to perform  for audiences without risking felony conviction.

The statute's prohibition on including in any performance even a "description or representation" of sexual conduct "in whatever form" in any location where it "could be viewed by a person who is not an adult" coupled with DAG Mulroy's admission that he has a constitutional obligation to enforce and would enforce the Adult Entertainment Act, meets the standard set forth in *Leonardson* and *Glenn* for a credible threat of enforcement.

---

[10] No matter how often the Government insists that this is not the effect of the Adult Entertainment Act, the terms "description or representation of ultimate sexual acts, normal or perverted," can readily be interpreted to include comedy that could appear on network television.

## IV.    <u>Conclusion</u>

This Court should rule that Friends of George's has standing and deny Defendant's Motion to Dismiss.

Respectfully submitted,

/s/ *Brice M. Timmons*
Brice M. Timmons (#29582)
Melissa J. Stewart (#40638)
Craig A. Edgington (#38205)
Donati Law, PLLC
1545 Union Ave.
Memphis, Tennessee 38104
(901) 278-1004 (Office)
(901) 278-3111 (Fax)
***Counsel for Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing was served upon all parties of record via the Court's ECF system on the 5th day of May, 2023.

/s/ *Brice M. Timmons*