**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

FRIENDS OF GEORGE'S, INC.,

     *Plaintiff*,

   v.

STEVEN J. MULROY,
  in his official and individual capacities,

     *Defendant*.

Case No. 2:23-cv-02163-TLP-tmp
Case No. 2:23-cv-02176-TLP-tmp

**POST-TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
OF DEFENDANT STEVEN J. MULROY IN HIS OFFICIAL CAPACITY**

As ordered by the Court, Steven J. Mulroy, in his official capacity, submits the following Proposed Findings of Fact and Proposed Conclusions of Law.

## PROPOSED FINDINGS OF FACT

1.      Plaintiff, Friends of George's, Inc., is a registered 501(c)(3) Tennessee non-profit organization operating in Memphis, Tennessee.  ECF No. 69 (Pretrial Order) at 955.[1]

2.      Plaintiff operates as a theatre company that "produces drag-centric performances, comedy sketches, and plays." *Id.*

3.      Plaintiff presents drag as an "art form" to an audience in a theatre context.  ECF No. 81 (Trial Tr. Day 1) at 1064, 1095.

4.      Plaintiff has "a production team" as well as "performers." *Id.* at 1065.

5.      A member of Plaintiff's board, ███████████, was the sole trial witness with personal knowledge of Plaintiff's performances.  In her view, drag is not inherently sexual and is an evolving art form.  *Id.* at 1068-69.

6.      Drag includes more than males impersonating females and females impersonating males.  *Id.* at 1068-69.

7.      Drag shows predominately are performed in adult night-life settings.  *Id.* at 1067.

8.      Since 2013, Plaintiff has staged a total of 96 shows, 94 of which have taken place at the Evergreen Theater.  *Id.* at 1109.

9.      Plaintiff has never put on a scripted play or musical show on public property.  *Id.* at 1110.

10.      Plaintiff has never sought a license to provide adult-oriented entertainment. *Id.* at 1111.

---

[1]  Pincites to record materials reference the "Page ID" numbers in the ECF file stamps.

11.     For its summer 2022 production, "Dragnificent Gay Old Opry," Plaintiff sold 625 general admission tickets at $27.00 for a total intake of $16,875.  *Id.* at 1107-08.

12.     For its 2022 holiday production, "A Wunderland Holiday," Plaintiff sold 629 general admission tickets at $27.00 for a total intake of $16,983.  *Id.*

13.     For its spring 2023 production, "Drag Rocks," Plaintiff sold 644 general admission tickets at $27.00 and 85 VIP tickets at $60.00 for a total intake of $22,509.  *Id.* at 1106-08.

14.     During Plaintiff's production history, no more than a "handful" of minors have attended Plaintiff's shows.  *Id.* at 1110; ECF No. 58-2 (Dep. of ▮▮▮▮▮▮▮) at 832.

15.     At the time of filing its initial complaint, Plaintiff did not know the precise content of its future shows.  ECF No. 64-2 (Pltf's Response to Requests for Admission) at 912-15; Trial Tr. Day 1 at 1100.

16.     Portions of Plaintiff's shows were testified about by Ms. ▮▮▮▮ at trial.  Ms. ▮▮▮▮ described one skit in which an actor playfully portrayed a caricature of English rock artist Rod Stewart.  "Rod Stewart's" costume featured his usual tight black pants but added a noticeable bulge in the area of his crotch.  Poking fun at Rod Stewart's reputation, "Rod Stewart" encounters an actor portraying an attractive "model" who eventually straddles him with her legs as they passionately kiss.  Trial Tr. Day 1 at 1076.

17.     In another skit, known as "Bitch You Stole My Purse," an actor plays a prostitute at a truck stop who seeks to solicit a truck driver.  The prostitute actor "sings" a song featuring references to "blow jobs," and "pooping" in someone's purse.  *Id.* at 1077.

18.     Another skit, known as "Dick in a Box," is based on the popular skit from National Broadcasting Company's "Saturday Night Live"—a late-night live television sketch comedy and political satire show.  The skit's featured song suggests to the audience that a gift package worn

2

by the actor next to the actor's crotch area supposedly contains the actor's penis as the contents of the gift package.  On stage, the box is filled with tissue, suggesting that the actor's penis is within. Whether the penis is within the box or is viewable at all is open to interpretation by the audience. *Id.* at 1078.

19.     In an additional skit, known as "Nurses," an actor portraying a nurse leans forward and audibly passes gas.  *Id.* at 1075.

20.     A video of other vignettes from Plaintiff's shows was displayed at trial and Ms. ███ testified about those vignettes.  In one, "The Tea with Sister Myotis," female impersonators gather around a table poking fun at the panel on American Broadcasting Company's program, "The View."   One of the "panelists," an actor portraying an older woman, makes satirical references to an actor portraying a newlywed woman who is introduced to the term "pigs in a blanket" in reference to her wedding night, which Ms. ███ explained references sexual intercourse and masturbation.  *Id.* at 1081-82.

21.     In another video vignette, six actors lip-synced "Paradise by the Dashboard Light" by the late artist Meat Loaf.  In one portion of the performance, actors are silhouetted behind a near-sheer screen and engaged in movements that mimic sexual intercourse.  And one of the actors has an encounter with her boyfriend and is later portrayed as noticeably pregnant.  *Id.* at 1083; Tr. Ex. 2.

22.     In the final video vignette, an older female impersonator with the *nom de guerre* "Trixie Thunderpussy" sings a song referred to as the "Pussy Song" that contains suggestive sexual references to the singer's "vagina."  Trial Tr. Day 1 at 1084.  This performance occurred in an age-restricted venue.  *Id.* at 1085.

23.     In November 2022, Plaintiff put on a show entitled "A Wunderland Holiday." Trial Ex. 1. The production included performers lip-synching and dancing to classic and modern holiday songs (Phyllis Navidad, All I Want for Christmas, BeBe's Holiday), inviting audience members to come onstage to learn the art of bow tying (Let's Make a Bow), and an original skit involving the story of the Nativity using various children's toys (Golide's Christmas Fable).

24.     In "writing and curating a show," Plaintiff tries "to stick around the PG-13 area in writing" and attempts to avoid "go[ing] over [a] too risqué type of thing." *Id.* at 1071.

25.     Also, in writing the shows, Plaintiff "tr[ies] not to go over anything that you can see in a rated R movie." *Id.*

26.     Ms. ██████ testified that the Adult Entertainment Act "probably wouldn't be a problem if somebody who wasn't in drag was performing" its content. *Id.*

27.     When asked whether Plaintiff's performances were "appropriate for children," Ms. ██████ stated: "I don't know if I would bring my five-year-old to a show, but I would definitely a 15, 16-year old, 17-year old." *Id.* at 1114. She agreed that the shows might "have artistic value for a 16 or 17-year-old, but not for a five or six-year old"—emphasizing that a 16- or 17-year-old would "absolutely" get value from the satire in Plaintiff's performances. *Id.*

28.     Plaintiff's shows are a form of artistic expression and have literary, artistic, and political value to a reasonable 17-year-old. *Id.*

29.     Plaintiff's shows do not feature nudity, graphic or obscene sexual simulations, and are not performed for the purpose of sexual gratification. *Id.* at 1101-03; Dep. of ██████ at 839-42, 844.

30.     Friends of George's and its performers have never "been charged with violating Tennessee obscenity laws." Trial Tr. Day 1 at 1100.

4

31.     Friends of George's and its performers have never "been threatened with violating Tennessee obscenity laws."  *Id.*

32.     The General Assembly enacted the Adult Entertainment Act on March 2, 2023, and Governor Lee signed it into law.  Pretrial Order at 955.

33.     The Act was passed to "clarify current law by requiring that adult-oriented performances may only be held in age restricted venues." ECF No. 35-1 (Tr. of Legislative Proceedings) at 515; *see also id.* at 515-16, 521, 544, 545, 547, 575, 576, 579.

34.     The legislature was not attempting to ban all drag shows.  *Id.* at 523, 537-38, 567, 593, 602, 605.

35.     The legislative history is full of legislators expressing their intent to protect minors from sexually-explicit performances.  *Id.* at 516-17, 520-21, 547 (Sen. Johnson); *id.* at 549 (Sen. Massey); *id.* at 567-68 (Sen. Roberts); *id.* at 602 (Rep. Zachary); *id.* at 606 (Rep. Bulso).

36.     During the legislative proceedings for the Adult Entertainment Act, witness Landon Starbuck testified that the "sexual desensitization [of children] . . . renders them more vulnerable to sexual predation," "empowers child predators[,] and increases the demand to exploit and sexually abuse children."  *Id.* at 525-26.

37.     Defendant Steven A. Mulroy is the District Attorney for the Thirtieth Judicial District of Tennessee, and the chief prosecutor for Shelby County, Tennessee with the authority to institute criminal prosecutions within his judicial district.  Pretrial Order at 955.

38.     D.A. Mulroy has confirmed that he is obligated and intends to enforce all Tennessee laws that fall within his prosecutorial jurisdiction, including the felony and misdemeanor crimes in the Adult Entertainment Act, codified at Tennessee Code Annotated § 7-51-1407.  *Id.*

### PROPOSED CONCLUSIONS OF LAW

1.      Plaintiff brings a pre-enforcement action under 42 U.S.C. § 1983 seeking to enjoin enforcement of the Adult Entertainment Act.

2.      An injunction is a "drastic and extraordinary" remedy that "should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).  To obtain a permanent injunction, a plaintiff must first prove "actual success" on the asserted claim. *Jolivette v. Husted*, 694 F.3d 760, 765 (6th Cir. 2012) (quotations omitted).  Without an actual or imminent "constitutional violation, there is no . . . unconstitutional conduct to enjoin." *Hearring v. Sliwowski*, 806 F.3d 864, 867 (6th Cir. 2015) (cleaned up).  Next, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law . . . are inadequate . . . ; (3) that . . . the balance of hardships between the plaintiff and defendant . . . warrant[]" a "remedy in equity . . .; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

3.      To determine whether Plaintiff has established Article III standing to seek injunctive relief and to analyze Plaintiff's claims, this Court must first determine the scope of the Adult Entertainment Act.

**<u>Scope of Adult Entertainment Act</u>**

<u>Harmful-to-Minors Standard</u>

4.      This Court finds that the Act applies only to performances that lack serious literary, artistic, political, or scientific value for a reasonable 17-year-old minor.

5.      The Act makes it an "offense for a person to perform adult cabaret entertainment" in certain locations.  Tenn. Code Ann. § 7-51-1407(c)(1).

6.     "Adult cabaret entertainment" means (A) "adult-oriented performances that are harmful to minors, as that term is defined in § 39-17-901, and that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers"; and includes (B) "a single performance or multiple performances by an entertainer."  Tenn. Code Ann. § 7-51-1401(12).

7.     Section 39-17-901 defines "harmful to minors" to mean "that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse when the matter or performance: (A) [w]ould be found by the average person applying contemporary community standards to appeal predominantly to the prurient, shameful or morbid interests of minors; (B) [i]s patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors; and (C) [t]aken as whole lacks serious literary, artistic, political or scientific values for minors."

8.     The Tennessee Supreme Court has narrowly construed "harmful to minors" in § 39-17-901 to include "only to those materials which lack serious literary, artistic, political, or scientific value for a reasonable 17-year-old minor."  *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 528 (Tenn. 1993).

9.     Federal courts are generally "bound by the state court's interpretation of its criminal laws."  *Rhodes v. Brigano*, 91 F.3d 803, 806 (6th Cir. 1996); *see also Johnson v. United States*, 559 U.S. 133, 138 (2010).

10.     And the text does not have different meanings depending on the context in which it is applied.  Thus, the Tennessee Supreme Court's construction of § 39-17-901 does not change based on the application of the statutory language.  "It is not at all unusual to give a statute's ambiguous language a limiting construction called for by one of the statute's applications, even

though other of the statute's applications, standing alone, would not support the same limitation. The lowest common denominator, as it were, must govern." *Clark v. Martinez*, 543 U.S. 371, 380 (2005).

11.     Accordingly, when applying the Adult Entertainment Act, *Davis-Kidd*'s construction of "the harmful to minors" definition in § 39-17-901 is controlling.

<u>The Applicable Locations</u>

12.     The Act makes it an "offense for a person to perform adult cabaret entertainment: (A) [o]n public property; or (B) [i]n a location where the adult cabaret entertainment could be viewed by a person who is not an adult." Tenn. Code Ann. § 7-51-1407(c)(1).

13.     Tenn. Code Ann. § 7-51-1407(c)(1)(B) could be interpreted in one of two ways: Plaintiff suggests that the provision should be read to apply "[i]n a location where the adult cabaret entertainment could [*permissibly or impermissibly*] be viewed by a person who is not an adult." Defendant, on the other hand, argues that the provision should be read to apply "[i]n a location where the adult cabaret entertainment could [*permissibly*] be viewed by a person who is not an adult." At least four different interpretive principles favor Defendant's narrower reading.

14.     *First,* "any interpretation of the [statute] that makes one [o]f its provisions irrelevant is presumptively incorrect," and Plaintiff's broad interpretation "has exactly this effect." *United States v. Perry*, 360 F.3d 519, 537 (6th Cir. 2004). If the law could apply to locations that minors *impermissibly* access, then it could literally be applied anywhere, as clever minors could theoretically sneak into any location. But if the law could apply anywhere, no location provision would be needed. The Act could have stopped after it said, "It is an offense for a person to perform adult cabaret entertainment." The Act certainly would not need the "on public property" provision.

Tenn. Code Ann. § 7-51-1407(c)(1)(A).  A broad reading thus would render both of the location provisions in the Act entirely unnecessary.

15.     *Second,* "a statutory scheme should be read so as to avoid creating internal conflicts when a more consistent interpretation is available." *Mich. Dep't of Educ. v. U.S. Dep't of Educ.*, 875 F.2d 1196, 1202 (6th Cir. 1989).  But, if the Act applies anywhere, then it would conflict with the reticulated statutory scheme addressing adult-oriented establishments.  Defendant's narrower reading avoids that problem and creates a "symmetrical and coherent regulatory scheme," with "all parts [fitting] into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (quotations omitted).  "[T]he natural reading of the statute is properly informed by the underlying purpose and the overall framework of the Act." *United States v. Shafer*, 573 F.3d 267, 278 (6th Cir. 2009).

16.     *Third,* "[t]he legislative history (for those who consider it) confirms, with unusual clarity," the Defendant's narrower interpretation. *Sturgeon v. Frost*, 139 S. Ct. 1066, 1085 (2019); *see also In re Corrin*, 849 F.3d 653, 657 (6th Cir. 2017) ("When the language is ambiguous or leads to an absurd result, the court may look at the legislative history of the statute to help determine the meaning of the language.").  Both the Senate Sponsor and the House Sponsor described the Act as "clarify[ing] current law by requiring that adult-oriented performances may *only be held in age-restricted venues*."  Tr. of Legislative Proceedings at 515 (Senator Johnson) (emphasis added); *see also id.* at 575 (Representative Todd) (stating that the Act "clarifies that adult-oriented performances may only be held in age-restricted locations").  And the legislative

discussion of the bill is replete with references to requiring age-restricted venues.  *Id.* at 515-16, 521, 544, 545, 547, 575, 576, 579.[2]

17.     *Fourth,* "the presumption of constitutionality" "holds that courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional."  *United States v. Davis*, 139 S. Ct. 2319, 2332 n.6 (2019).   "[E]very reasonable construction must be resorted to in order to save a [legislative act] from unconstitutionality."  *Hooper v. California*, 155 U.S. 648, 657 (1895).  The Court must "construe the statute to avoid constitutional [overbreadth] problems." *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982); *Deja Vu of Cincinnati v. Union Twp. Bd. of Trs.*, 411 F.3d 777, 786 (6th Cir. 2005).    And the text of the Act is, at a minimum, "readily susceptible" to Defendant's proposed construction.  *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988) (quotations omitted).

18.     Given these interpretive principles, the Court interprets Tenn. Code Ann. § 7-51-1407(c)(1)(B) to apply where the adult cabaret entertainment could *permissibly* be viewed by a person who is not an adult, and not to apply to every location that a minor could *permissibly and impermissibly* view a performance.

19.     The Court separately holds that the statute contains a *mens rea* requirement.  The *Davis-Kidd* Court stated that "[i]n the context of criminal statutes regulating obscenity, the State must establish that the defendant had knowledge of the contents and character of the" speech at

---

[2] Plaintiff's own witness (and attorney) understood the law to apply only to areas where shows could permissibly be viewed by minors.  Trial Tr. at 1069 ("[T]he law says it applies to -- only to performances that could be viewed by persons under 18 years old.  Why is that a problem for Friends of George's?  A.  Well, we don't card."); *id.* at 1150 ("The Friends of George's has a second purpose and that is to remove drag from bars and nightclubs and bring it into a more respectable setting that isn't associated with alcohol, *isn't age restricted*, that don't have that sort of stigma. And if on Friends of George's performers are not allowed to perform conduct -- excuse me -- perform shows that include protected speech in such venues, *they're forced back into those bars and nightclubs*." (emphasis added)).

issue.  866 S.W.2d at 528.  This *mens rea* requirement would block application of the Act to performers in age-restricted venues if they lacked knowledge that a minor had impermissibly entered.

## Article III Standing

20.    To find Article III standing here, this Court must conclude that Plaintiff's shows, taken as a whole, at least arguably lack serious literary, artistic, political, or scientific value for a reasonable 17-year-old minor.  Having viewed the portions of Plaintiff's past shows that it offers as potentially problematic under the Adult Entertainment Act, the Court cannot find that Plaintiff's shows arguably lack serious literary, artistic, political, or scientific value for a reasonable 17-year-old minor.

21.    To establish standing, the plaintiff must show "(1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief."  *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1646 (2022).

22.    To establish an injury in a pre-enforcement *Ex parte Young* action, a plaintiff must prove "an intention to engage in a course of conduct arguably affected with a constitutional interest[] but proscribed by" state law.  *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 454 (6th Cir. 2017) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  It must then prove "a *certain* threat of prosecution if the plaintiff does indeed engage in that conduct."  *Id.* at 455.  "[I]maginative," "speculative" "[f]ears of prosecution" are not enough.  *Morrison v. Bd. of Educ. of Boyd Cty.*, 521 F.3d 602, 609-10 (6th Cir. 2008) (quotations omitted).

23.    While "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), concrete evidence of an intention to engage in conduct arguably covered by the law is required.

24.    Plaintiff has not presented evidence proving its intention to engage in a course of conduct that is even arguably proscribed by the Adult Entertainment Act.

25.    Plaintiff presented no evidence that its future shows will or even intend to contain material that is "harmful to minors."  Indeed, at the commencement of this suit (the relevant period for determining standing, *Cleveland Branch, NAACP v. City of Parma,* 263 F.3d 513, 524-25 (6th Cir. 2001)), Plaintiff did not "know the precise content of . . . future productions."  Pltf's Response to Requests for Admission at 912-15; Trial Tr. Day 1 at 1100.

26.    Plaintiff has also presented no content from any of its prior shows that even arguably "lack[s] serious literary, artistic, political, or scientific value for a reasonable 17-year-old minor."  *Davis-Kidd*, 866 S.W.2d at 528.  And, even if the Court could conclude that an individual scene arguably lacks value, "[t]he artistic merit of a work does not depend on the presence of a single explicit scene."  *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 248 (2002).

27.    There is only one complete show in the record, *see* Trial Ex. 1, and there is no question that it has artistic value to a reasonable 17-year-old.  For the scenes of Plaintiff's shows displayed at trial, Plaintiff failed to introduce the entirety of the work into the record, so the Court cannot evaluate the work's artistic merit as a whole.  *Ashcroft*, 535 U.S. at 248; Trial Ex. 2. Regardless, even (improperly) viewing the scenes in isolation, the scenes displayed at trial clearly contain artistic value to a reasonable 17-year-old.  *See* Trial Ex. 2.

28.    Plaintiff itself asserts that its productions have artistic value to a reasonable 17-year-old.  When asked whether Plaintiff's performances were "appropriate for children," Ms. ▮▮▮▮ stated: "I don't know if I would bring my five-year-old to a show, but I would definitely a 15, 16, 17-year old, 17-year old."  Trial Tr. Day 1 at 1114.  And she agreed that the shows might "have

artistic value for a 16 or 17-year-old, but not for a five or six-year old"—emphasizing that a 16- or 17-year-old would "absolutely" get value from the satire in Plaintiff's performances. *Id.*

29.     Plaintiff has not proven a concrete intention to put on a show that even arguably lacks literary, artistic, political, or scientific value to a reasonable 17-year-old; it has pointed to nothing "beyond [its] own subjective apprehension" and "imaginative," "speculative" "[f]ears of prosecution" that have no basis in reality or the actual scope of the Act. *Morrison*, 521 F.3d at 610 (quotations omitted).

30.     Plaintiff's other attempts to show standing fail.

31.     "Bringing an overbreadth claim does not give [Plaintiff] carte blanche to maintain a suit in federal court." *Phillips v. DeWine*, 841 F.3d 405, 417 (6th Cir. 2016). "Although the overbreadth doctrine creates a relaxed approach to *prudential* standing" rules, the doctrine "does not affect constitutional standing, which is a *constitutional* mandate that is absolute and irrevocable." *Birmingham v. Nessel*, No. 21-1297, 2021 WL 5712150, at *3 (6th Cir. Dec. 2, 2021) (quotations omitted). "Because the [Act] has not injured [Plaintiff], [Plaintiff] cannot rely on the rights of others to challenge it." *Davis v. Colerain Twp.*, 51 F.4th 164, 173 (6th Cir. 2022).

32.     The Sixth Circuit has likewise "repeatedly rejected . . . claims that concerns about 'chilling' speech allow[s] [courts] to water down Article III's core constitutional components." *Id.*; *see also, e.g.*, *Phillips*, 841 F.3d at 417; *Birmingham*, 2021 WL 5712150, at *3; *Morrison*, 521 F.3d at 610. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Phillips*, 841 F.3d at 417 (cleaned up); *see also McKay v. Federspiel*, 823 F.3d 862, 868-69 (6th Cir. 2016). Both the Supreme Court and the Sixth Circuit have been "emphatic" on this point, repeatedly explaining that "an allegation of 'chill,' by itself, is insufficient to establish standing in a First Amendment

case." *Fieger v. Mich. S. Ct.*, 553 F.3d 955, 962 (6th Cir. 2009).  Indeed, at trial, Plaintiff abandoned the position that "subjective chill per se is sufficient to [prove] standing."  ECF No. 82 (Trial Tr. Day 2) at 1255.

33.    Nor can Plaintiff invoke the associational standing doctrine.   To establish associational standing, an organization must "identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct."  *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543 (6th Cir. 2021); *Shelby Cnty. Advocs. for Valid Elections v. Hargett*, No. 2:18-cv-02706-TLP-dkv, 2019 WL 4394754, at *8 (W.D. Tenn. Sept. 13, 2019) (Parker, J.).

34.    Plaintiff fails to satisfy this requirement.   For one, Plaintiff cannot identify an injured member, because it cannot show that its entertainers even arguably intend to put on a performance that "lack[s] serious literary, artistic, political, or scientific value for a reasonable 17-year-old minor." *Davis-Kidd*, 866 S.W.2d at 528.  Moreover, Plaintiff's complaint fails to identify *any specific performer* by name.  Plaintiff cannot remedy that deficiency by naming a member at trial.  If that were the case, then plaintiffs could conceal the identity of their harmed members until after the close of the discovery—frustrating the entire purpose of requiring a named party to facilitate an inquiry into whether that member is actually harmed.

35.    It is true that the "requirement of naming the affected members has . . . been dispensed with . . . where *all* the members of the organization are affected by the challenged activity." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009).  But Plaintiff has not presented proof as to who its members are or what their various roles in the organization are—let alone who actually performs in its shows.  The evidence presented indicates that not everyone performs.  *See* Trial Tr. Day 1 at 1064 (████ testifying that she is "a member of the board" and

"help[s] with back of the house, front of the house, production"); ECF 64-3 at 926-27; Trial Tr. Day 1 at 1065 (████ stating that Plaintiff has "a production team" as well as "performers").

36.     Regardless, Plaintiff's argument "rests on a misinterpretation of the" Act. *Ass'n of Am. Physicians*, 13 F.4th at 544. Plaintiff claims that everyone faces harm under the Act because the Act criminalizes everyone tangential to a production that is harmful to minors. But the Act only covers those who "perform." Tenn. Code Ann. § 7-51-1407(c)(1). And, even then, it only covers the entertainers who actually perform content that is harmful to minors. The Act's *mens rea* requirement prevents Plaintiff's sweeping interpretation of the Act. *Davis-Kidd*, 866 S.W.2d at 528. Moreover, when defining "adult cabaret entertainment," the Act uses the term "performance" on an individual basis, not to refer to the production as a whole. Tenn. Code Ann. § 7-51-1401(12). In fact, the Act specifically addresses "performances" at the entertainer level of generality, referencing "performances *by an entertainer*." *Id.* (emphasis added).

37.     Ultimately, Plaintiff cannot prove standing because its shows have "literary, artistic, political, or scientific value for a reasonable 17-year-old minor." *Davis-Kidd*, 866 S.W.2d at 528. Plaintiff has provided no evidence that its shows will lack artistic value to a reasonable 17-year-old moving forward. Accordingly, Plaintiff cannot show an intention to engage in conduct that is even arguably proscribed by the Act.

**First Amendment Claim**

38.     Plaintiff challenges the Adult Entertainment Act as facially overbroad.

39.     The overbreadth doctrine allows courts to "invalidate[] [a statute] as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 449 n.6 (2008)). But invalidation for

15

overbreadth is "strong medicine" that courts dispense "with hesitation, and . . . only as a last resort." *Ferber*, 458 U.S. at 769 (quotations omitted); *Connection Distrib.*, 557 F.3d at 336 (noting that this type of challenge is "disfavored").

40. Courts have "vigorously enforced the requirement that a statute's overbreadth be *substantial* . . . relative to the statute's plainly legitimate sweep," *United States v. Williams*, 553 U.S. 285, 292 (2008), and "the burden of demonstrating . . . substantial overbreadth" is on the challenger, *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (quotations omitted). Plaintiff fails to bear that burden.

<u>Plaintiff Fails to Challenge a Substantial Number of Applications</u>

41. Plaintiff has not challenged a "substantial" number of the applications of the Act.

42. The Adult Entertainment Act restricts access to certain content that is "harmful to minors"—i.e., content that is obscene as to minors under an adapted *Miller* test. *See* Tenn. Code Ann. § 39-17-901(6).

43. That restriction encompasses two types of speech: (1) speech obscene to adults and minors, and (2) speech obscene to minors but not adults. The difference between those two categories is "slight[]" because "material that appeals to the prurient interests of some group of adolescents or postadolescents will almost inevitably appeal to the prurient interests of some group of adults as well." *Ashcroft v. ACLU*, 542 U.S. 656, 679 (2004) (Breyer, J., dissenting) (cleaned up).

44. Plaintiff challenges only the application of the Act to speech obscene to minors but not adults. It provided no response to Defendant's arguments on the regulation of speech obscene to minors *and* adults. ECF No. 58 at 791-93.

45.     But "only a minimal number of [performances] will have serious value for reasonable adults but not for reasonable minors." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1506 (11th Cir. 1990).  That is particularly true under Tennessee law, where the question is whether the performance "lack[s] serious literary, artistic, political, or scientific value *for a reasonable 17-year-old minor*." *Davis-Kidd*, 866 S.W.2d at 528 (emphasis added).

46.     Accordingly, even accepting Plaintiff's merits arguments, Plaintiff has failed to bear its burden of showing that it challenges a *substantial* number of applications of the Act.

**Plaintiff's First Amendment Challenge Lacks Merit**

47.     In any event, the application of the Act to material obscene to minors but not adults comports with the First Amendment.

The Scrutiny Applied to Time-Place-Manner Restrictions Governs

48.     For two independent reasons, strict scrutiny does not apply.

49.     *First*, strict scrutiny does not apply when a statute prohibits minors from accessing content that is obscene as to minors, but not as to adults, if adults can still obtain the speech.

50.     "[S]peech within the rights of adults to hear may not be silenced completely in an attempt to shield children from it."  *See Ashcroft*, 535 U.S. at 252.  But courts have recognized that "some limitation on the access of adults to material protected for them but harmful to minors is permissible."  *Webb*, 919 F.2d at 1501; *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 69-70 (1976); *Ginsberg v. New York*, 390 U.S. 629, 640 (1968).

51.     When analyzing the "regulation of speech unprotected as to minors that indirectly affects speech protected as to adults," courts have routinely declined to apply strict scrutiny.  *Webb*, 919 F.2d at 1502.  "A number of courts have evaluated variously defined restrictions on the display of material 'harmful to minors' in light of the constitutional standards for a reasonable time, place,

and manner regulation" or a similar balancing test. *Id.* at 1501-02; *see also Upper Midwest Booksellers Ass'n v. City of Minneapolis*, 780 F.2d 1389, 1394 (8th Cir. 1985); *M.S. News Co. v. Casado*, 721 F.2d 1281, 1288 (10th Cir. 1983); *Athenaco, Ltd. v. Cox*, 335 F. Supp. 2d 773, 782 (E.D. Mich. 2004).

52.     The Supreme Court's decisions in *Reno v. ACLU*, 521 U.S. 844 (1997) and *Ashcroft v. ACLU*, 542 U.S. 656 (2004), do not hold otherwise.  There, the statutes in the context of then-extant technological limitations combined to impose a "blanket restriction on speech" that "resemble[d] [an outright] ban."  *Reno*, 521 U.S. at 868, 875; *see also Ashcroft*, 542 U.S. at 667 (referring to "universal restrictions at the source" of the content).  By contrast, the Adult Entertainment Act does not ban speech.  It requires the speech to occur in an adult-only zone that minors cannot permissibly access.

53.     *Second*, the secondary effects doctrine provides an independent basis for declining to apply strict scrutiny.

54.     Under that doctrine, "the government [can] accord differential treatment to a content-defined subclass of speech [if] that subclass [i]s associated with specific 'secondary effects' of the speech."  *Daunt v. Benson*, 956 F.3d 396, 420 (6th Cir. 2020).  That is, even if a law is "plainly content-based" in a technical sense, courts apply "the standard applicable to content-neutral regulations" to statutes that curb the secondary effects of the restricted speech.  *Richland Bookmart, Inc. v. Nichols*, 137 F.3d 435, 440 (6th Cir. 1998).

55.     By protecting children from obscene content, the Act addresses the secondary effects associated with exposing children to such content—namely, an increase in "sexual exploitation crimes."  Tr. of Legislative Proceedings at 528.

56.     The prevention of "sexual assault" qualifies as a secondary effect.  *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 583 (1991) (Souter, J., concurring in judgment); *Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 132-34 (6th Cir. 1994) (noting Justice Souter's *Barnes* concurrence as the narrowest-grounds and, thus, controlling).  The primary effect of the Act is the direct protection of children from exposure to the regulated content.  The secondary effect that flows from that protection is to reduce sexual exploitation crimes by preventing the "sexual desensitization [of children that] renders them more vulnerable to sexual predation," "empowers child predators[,] and increases the demand to exploit and sexually abuse children."  Tr. of Legislative Proceedings at 525-26.

57.     Plaintiff challenges the basis for the Legislature's conclusion.  But the Legislature heard testimony on this problem, and the issue is within the sound judgment of the Legislature to address.  "[T]here is no hard-and-fast rule that the government have *any* empirical data directly supporting a link between a given regulation and the secondary effect it is purported to ameliorate." *Ent. Prods., Inc. v. Shelby Cty.*, 721 F.3d 729, 734 (6th Cir. 2013).  And this Court declines to impose an evidentiary burden on state policymakers.

58.     Plaintiff also claims that the secondary effects were not the Act's "predominant concern[]."  ECF No. 62 at 875 (emphasis omitted).  But Plaintiff provides no argument to support that contention, no cites to the legislative record, and no explanation for its conclusion.

59.     The prevention of the "primary effects" (the harm to children from viewing the content) and the secondary effects (an increase in sexual exploitation of children) are inextricably intertwined.  Because the Act curbs secondary effects, the Court has yet another basis for analyzing it as a content-neutral regulation under the time-place-manner standard.

        Strict Scrutiny Does Not Apply to the Act.

19

60.     Plaintiff's two contrary arguments for heightened scrutiny lack merit.

61.     *First*, the Act's reference to performances "that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers" does not warrant the imposition of strict scrutiny.

62.     "[S]peaker distinctions . . . are not presumed invalid under the First Amendment" or subjected to "strict scrutiny" unless "they reflect the Government's preference for[,] . . . or aversion to[,] what the disfavored speakers have to say." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 645, 658 (1994).

63.     The Act addresses performances that are (1) "harmful to minors, as that term is defined in § 39-17-901" and (2) "that feature topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers." Tenn. Code Ann. § 7-51-1401(12).   The harmful-to-minors component imposes a constitutionally permissible subject-matter restriction that is analyzed as a time-place-manner restriction.  And the second component merely identifies performers who engage in that type of performance.

64.     The reference to specific types of performers clarifies the type of speech that is "harmful to minors" without narrowing the covered speech.  An example illustrates the point.  If the list of covered performers included only "male or female impersonators," then an argument could be made that the State was using an identity-based restriction as a "means of exercising a content preference." *Turner*, 512 U.S. at 645.  In that example, the State would be singling out performances "harmful to minors" given by a particular group that engages in a specific type of speech.  But the Act does just the opposite.  It lists types of performers that may engage in sexual speech "harmful to minors" and then includes a catchall— "or similar entertainers."

65.     Plaintiff has not—and cannot—identify a situation where a performer engages in a performance "harmful to minors" but does not qualify as a "similar entertainer." Tenn. Code Ann. § 39-17-901(6); *id.* § 7-51-1401(12). That is, there is no instance in which some performers can engage in performances "harmful to minors" and other performers cannot.

66.     Indeed, Plaintiff recognized at argument that "similar entertainers, in a generous interpretation, would include other performers who are engaged in similar kinds of performances, that you would usually find in age-restricted bars and clubs." Trial Tr. Day 1 at 1215.

67.     Therefore, the identity-based clause adds no content-based restriction to the "harmful to minors" clause, which is properly analyzed as a time-place-manner restriction.

68.     *Second*, the Court cannot conclude that the Tennessee Legislature passed the Adult Entertainment Act to target drag shows.

69.     The text of the Act—"the best indicator of intent," *Nixon v. United States*, 506 U.S. 224, 232 (1993)—undermines the contention that the Legislature targeted family-friendly drag shows. The statute prohibits only performances that include "nudity, sexual excitement, sexual conduct, excess violence or sadomasochistic abuse" that "appeal[s] predominantly to the prurient, shameful or morbid interests of minors," in a "patently offensive" way that "lacks serious literary, artistic, political or scientific values for minors." Tenn. Code Ann. § 39-17-901(6); *id.* § 7-51-1407(c)(1). And it imposes the same restrictions on drag performers that it imposes on other entertainers who may provide sexually-explicit performances. *Id.*

70.     In fact, the Act copies verbatim from laws that have governed adult establishments and adult cabaret for decades, further undermining any notion that the legislature targeted drag performances. Tenn. Code Ann. § 7-51-1401(2) (1995) (defining "adult cabaret" to mean "cabaret

that features topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers"); *id.* § 39-17-901 (1990) (defining "harmful to minors").

71.    The legislative history likewise proves that there was no improper purpose.  The Legislature was not attempting to ban all drag shows.  Tr. of Legislative Proceedings at 523, 537-38, 567, 593, 602, 605.  The legislative history is replete with statements of legislators expressing their intent to protect minors from sexually explicit performances.  *Id.* at 516-17, 520-21, 547 (Sen. Johnson); *id.* at 549 (Sen. Massey); *id.* at 567-68 (Sen. Roberts); *id.* at 602 (Rep. Zachary); *id.* at 606 (Rep. Bulso).  And it contains repeated references to the goal of requiring performances that contain content harmful to minors to occur in age-restricted venues.  *Id.* at 515-516, 521, 544-45, 547, 575-76, 579.

72.    Plaintiff stated at argument that it was no longer "maintaining the argument that the legislature specifically intended to target drag performers, that it was discriminatory against specific drag performers."  Trial Tr. Day 1 at 1236.  It then reiterated: "I don't think that the text of the statute exclusively targets drag performers.  But drag is speech and it is part of the speech that is included in this statute."  Trial Tr. Day 2 at 1257.

73.    The Court declines to find an improper purpose underpinning the Act and, therefore, declines to apply strict scrutiny.

The Act Passes Constitutional Review

74.    Whatever tier of scrutiny applies, the Act passes constitutional review.

75.    The Act furthers a compelling state interest.  The Supreme Court has stated that "[i]t is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling."  *Ferber*, 458 U.S. at 756-57 (quotations omitted).  And the Supreme Court has recognized, too, that this "compelling interest . . . extends

to shielding minors from the influence" of speech "that is not obscene by adult standards." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989).

76.     Binding precedent resolves the question whether a compelling interest exists here. *Crawford v. Lungren*, 96 F.3d 380, 386 (9th Cir. 1996) (compiling Supreme Court precedent).

77.     And Plaintiff concedes that the State has an interest in protecting children.  Trial Tr. Day 2 at 1280.

78.     The Adult Entertainment Act is narrowly tailored to address Tennessee's compelling interest in shielding minors from exposure to obscene performances.  The Act applies only to "a narrow slice of speech"—sexual speech that is obscene to minors under an adapted *Miller* test.  *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 452 (2015).  And the Act does not ban that speech; it merely requires the performances to occur in adult-only zones where children cannot permissibly view the performance.  The Act thus "tightly fits the State's compelling interest" by "limiting children's exposure," while "still allow[ing] adults to" view the performances. *Crawford*, 96 F.3d at 387.  It "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy": exposure of children to obscene speech.  *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).

79.     "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals."  *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000).

80.     The only argument in Plaintiff's briefing that could even be construed as a less-restrictive-alternative contention is its challenge to the lack of parental consent exception.

81.     That argument fails.  The State is not required to provide a parental-consent exception for every restriction related to minors.  When it comes to regulating minors' access to

23

sexually explicit materials, the State has its own "*independent* interest in the well-being of its youth." *Ginsberg*, 390 U.S. at 640 (emphasis added). That interest does not disappear because of parental consent. And a restriction with a parental consent exception would not further the State's interest. This is why, for example, children are not allowed in adult-oriented establishments—like strip clubs—even with their parents' consent. *See* Tenn. Code Ann. § 7-51-1113(e). And it is why children cannot participate in pornography, even if their parents would allow it. *Connection Distrib.*, 557 F.3d at 328-29 ("Congress may suppress child pornography in its entirety due to its scarring impact on the children."). Plaintiff errs in suggesting that laws without parental consent exceptions categorically fail strict scrutiny.

*     *     *

82.     Plaintiff fails to identify a single decision facially invalidating a statute that requires content obscene to minors to occur in an adult-only area. Given the evidence and argument presented, this case will not be the first. The Act passes constitutional review.

**<u>Vagueness Claim</u>**

83.     The Adult Entertainment Act is not unconstitutionally vague.

84.     "Condemned to the use of words, we can never expect mathematical certainty in our language." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)).

85.     And just because a statutory phrase may need interpretation or construction does not mean that it is unconstitutionally vague. *Skilling v. United States*, 561 U.S. 358, 405 (2010) ("It has long been our practice, . . . before striking a . . . statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction.").

86.     The Supreme Court has made clear that state statutes following the *Miller* obscenity test are not unconstitutionally vague. *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 57 (1989). "The mere fact juries may reach different conclusions as to the same material does not mean that constitutional rights are abridged." *Miller v. California*, 413 U.S. 15, 26 n.9 (1973).

87.     The tailoring of the *Miller* standard to "minors" does not somehow render it unconstitutionally vague.

88.     In *Ginsberg v. New York*, the Supreme Court rejected a vagueness challenge to a definition of "harmful to minors" that differs only slightly from the definition at issue here. 390 U.S. at 643-46; *Casado,* 721 F.2d at 1286–87 (stating that "[a]lthough the ordinance [at issue] alters the *Miller* test so that it can be used for determining what material is harmful to minors, this is precisely what the ordinance in *Ginsberg* did with the old *Memoirs* test"[3] and *Ginsberg* found no vagueness problem).

89.     Moreover, numerous Courts of Appeals have rejected vagueness challenges to statutes that adapt *Miller*'s test to minors. *See Am. Booksellers Ass'n v. Virginia*, 882 F.2d 125, 127 n.2 (4th Cir. 1989); *Webb*, 919 F.2d at 1503 & n.18; *Casado*, 721 F.2d at 1286-87.

90.     Plaintiff points to *ACLU v. Mukasey*, but the court there took issue with the definition of "minor," rather than the modified *Miller* standard more generally. 534 F.3d 181, 205 (3d Cir. 2008). It recognized that "minor" could cover anyone under the age of 18 and stated that "materials that could have 'serious literary, artistic, political, or scientific value' for a 16-year-old would not necessarily have the same value for a three-year-old." *Id.* But the Tennessee Supreme Court has resolved any issue by interpreting Tennessee's "harmful to minors" definition in § 39-

[3] The *Casado* court was referencing *Memoirs v. Massachusetts*, 383 U.S. 413, 418 (1966).

17-901 to include "only to those materials which lack serious literary, artistic, political, or scientific value for a reasonable 17-year-old minor." *Davis-Kidd*, 866 S.W.2d at 528.

91.    The harmful-to-minors standard is no more vague than the *Miller* standard itself.

92.    Plaintiff argues that the Act is vague because it defines the regulated content based on community standards in "the judicial district."  But the Supreme Court has explicitly stated that "[a] State may choose to define an obscenity offense in terms of 'contemporary community standards' as defined in Miller without further specification . . . or it may choose to define the standards in more precise geographic terms." *Jenkins v. Georgia*, 418 U.S. 153, 157 (1974).

93.    And there is no constitutional problem with defining the relevant "community" for a *Miller* analysis as the judicial district. *Hamling v. United States*, 418 U.S. 87, 106 (1974); *United States v. Little*, 365 F. App'x 159, 164 (11th Cir. 2010).  Defining the relevant community as the judicial district mirrors the default rule—that "obscenity is determined by the standards of the community where the trial takes place." *United States v. Thomas*, 74 F.3d 701, 711 (6th Cir. 1996).

**<u>Mandatory Equitable-Factor Test</u>**

94.    "According to well-established principles of equity, a plaintiff seeking a permanent injunction *must* satisfy a four-factor test before a court may grant such relief." *eBay*, 547 U.S. at 391 (emphasis added).

95.    "An injunction should issue only if the traditional four-factor test is satisfied." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010).

96.    Plaintiff presented no briefing or argument on the mandatory four-factor test, so it has forfeited its request for a permanent injunction.  This Court declines to grant the "drastic and extraordinary remedy" of injunctive relief without any briefing on factors mandated by the Supreme Court. *Id.* at 165.

### PROPOSED JUDGMENT

The Court denies Plaintiff Friends of George's request to enjoin the Adult Entertainment Act.  Public Chapter No. 2, 113th General Assembly (2023).  Plaintiff does not have Article III standing to challenge the Act.  Plaintiff has presented no evidence that its future shows intend to violate the Act.  And Plaintiff's prior shows, taken as a whole, do not even come close to lacking serious literary, artistic, political, or scientific value for a reasonable 17-year-old.  Accordingly, Plaintiff cannot establish an intention to engage in conduct that is even arguably proscribed by the challenged statute.

Moreover, even if Plaintiff had standing, its facial overbreadth claim fails.  Plaintiff fails to challenge a *substantial* number of the Act's applications; it only challenges application to the narrow sliver of speech that lacks value to a reasonable 17-year-old but has value to a reasonable 18-year-old.  And, for the limited applications challenged, Plaintiff cannot show that the Act is unconstitutional.  This Court declines to interpret the Act's reference to "a location where the adult cabaret entertainment could be viewed by a person who is not an adult" as applying anywhere that a minor could permissibly *and impermissibly* access.  Such a reading would render the location provisions of the statute entirely meaningless, would conflict with the statutory scheme, would defy the clear legislative intent, and would jettison fundamental constitutional avoidance principles.  Instead, the Court reads the statute as prohibiting adult cabaret entertainment only in locations where the entertainment could permissibly be viewed by a person who is not an adult.  Because the law creates the requirement of an adult-only zone, the standard governing time-place-manner restrictions applies.  And even under strict scrutiny, the Act passes constitutional review.

The Court, therefore, declines to grant injunctive relief and enters judgment in favor of Defendant.

27

## ALTERNATIVE PROPOSED JUDGMENT

In the alternative, assuming some unconstitutional applications, the Court should still decline to *facially* invalidate the Act under the "disfavored" overbreadth doctrine. *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 336 (6th Cir. 2009) (en banc). In that event, any injunctive relief should be limited as described in the following Proposed Limited Injunction Order:

## PROPOSED LIMITED INJUNCTION ORDER

1.      The Court declines to facially invalidate the Act. The Court limits its injunctive relief in two ways: (1) it limits the injunctive relief to the identified unconstitutional applications of the statute and (2) it limits the injunctive relief to the parties before the Court.

<u>Injunction Limited to Unconstitutional Applications</u>

2.      "[T]he normal rule is that partial, rather than facial, invalidation is the required course, such that a statute may be declared invalid to the extent that it reaches too far, but otherwise left intact." *Ayotte v. Planned Parenthood*, 546 U.S. 320, 329 (2006) (cleaned up).

3.      "A court may enjoin the unconstitutional applications of the law while preserving the other valid applications of the law." *Connection Distrib.*, 557 F.3d at 342.

4.      The asserted constitutional violation here turns on the view that the law can be applied in situations where minors impermissibly access a forum (by evading an age-restriction) where entertainers are performing content that is harmful to minors.

5.      To avoid a "judicial trespass," *id.* at 335, the Court enjoins enforcement of the law only to those applications of the Act. *United States v. Grace*, 461 U.S. 171, 180-83 (1983) (holding unconstitutional a federal statute banning expressive displays only insofar as it extended to public sidewalks); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504-05 (1985) (holding

28

unconstitutional a state statute aimed and preventing the publication of obscene material only insofar as the term "lust" is taken to include "normal sexual appetites").

6.      Enjoining only these allegedly unconstitutional applications ensures that the Court does not "nullify more of a legislature's work than is necessary, for [it] know[s] that [a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Ayotte*, 546 U.S. at 329 (quotations omitted).

7.      [A more intrusive option that Defendant offers in the alternative] The Court severs "in a location where the adult cabaret entertainment could be viewed by a person who is not an adult" from the Act.  The Supreme Court imposes a "strong presumption" that "an unconstitutional provision in a law is severable from the remainder of the law or statute," even in the absence of a severability clause.  *Barr v. Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335, 2350 (2020).

8.      The language "in a location where the adult cabaret entertainment could be viewed by a person who is not an adult" can be severed from the Act if the Court declines to adopt a narrowing construction.  "[T]he remainder of the statute [would be] capable of functioning independently."  *Id.* at 2352 (quotations omitted).  The "on public property" provision (which is not at issue in this case) remains valid and enforceable.

Injunction Limited to the Parties

9.      The injunction is limited to D.A. Mulroy in his official capacity.  "[F]ederal courts enjoy the power to enjoin individuals tasked with enforcing laws, not the laws themselves." *Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) (citing *California v. Texas*, 141 S. Ct. 2104, 2115-16 (2021)) (denying application for an injunction pending appeal).  Moreover, the parties agree that D.A. Mulroy is the official to enjoin.  Trial Tr. Day 2 at 1291.

10.    The injunction is limited to preventing enforcement of the Act against Plaintiff. Injunctions can be "no more burdensome . . . than necessary to provide complete relief to the plaintiffs." *Commonwealth v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see, e.g., Trump v. Hawaii*, 138 S. Ct. 2392, 2424-29 (2018) (Thomas J., concurring).

11.    "[A] remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (quotations omitted).   Accordingly, if the arguable threat of enforcement against Plaintiff gives rise to the Article III injury, then an injunction preventing Mulroy from enforcing the Act against Plaintiff would fully redress that injury.  *Id.; see also DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., joined by Thomas, J., concurring) ("When a district court orders the government not to enforce a rule against the plaintiffs in the case before it, the court redresses the injury that gives rise to its jurisdiction in the first place. But when a court goes further than that, ordering the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies.").

This Court therefore ENJOINS Shelby County District Attorney Steven Mulroy from enforcing Tenn. Code Ann. 7-51-1407(c)(1)(B) against Plaintiff, Friends of George's, when minors impermissibly access a forum where entertainers are performing content that is harmful to minors.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter


s/James R. Newsom III
James R. Newsom III (TN BPR No. 6683)
Special Counsel
J. Matthew Rice (TN BPR No. 40032)
Special Assistant to the Solicitor General
Robert W. Wilson (TN BPR No. 34492)
Senior Assistant Attorney General
Steven J. Griffin (TN BPR No. 40708)
Assistant Attorney General
Office of the Tennessee Attorney General
40 South Main Street, Suite 1014
Memphis, TN 38103
(901) 543-2473
Jim.Newsom@ag.tn.gov
Matt.Rice@ag.tn.gov
Robert.Wilson@ag.tn.gov
Steven.Griffin@ag.tn.gov

*Counsel for Steven J. Mulroy, in his official
capacity as District Attorney General for the
Thirtieth Judicial District of Tennessee*

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing report. Parties may access this filing through the Court's electronic filing system.

s/James R. Newsom III
James R. Newsom III
Special Counsel