IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| FRIENDS OF GEORGE'S, INC. <br><br> PLAINTIFF, <br><br> v. <br><br> STEVEN J. MULROY, *in his individual and official capacity as District Attorney General of Shelby County, Tennessee*, <br><br> DEFENDANT | Case No. 2:23-cv-02163-TLP-tmp <br><br> **COMPLAINT FOR VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1871, 42 U.S.C. § 1983** |

**PLAINTIFF'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the Court's direction, Plaintiff, Friends of George's, Inc. ("Plaintiff" or "Friends of George's" proposes the following findings of fact and conclusions of law for the Court's consideration in preparing its final order in this cause:

**Plaintiff's Proposed Findings of Fact:**

Plaintiff, Friends of George's, Inc., proposes and respectfully asks the Court to adopt the following findings of fact:

1. Friends of George's is a non-profit organization. ECF No. 69 (Pretrial Order) PageID 955, 1.

2. Friends of George's is a drag-centric theatre group. ECF No. 69 (Pretrial Order) PageID 955, 2.

3. The membership of Friends of George's includes board members, production-team members, and performers. ECF 81 at PageID 1065:13–17.

4. Drag is an ever-evolving art form that includes males impersonating females and females impersonating males. ECF 81 at PageID 1068:11-18.

5. Several Friends of George's board members are also performers who impersonate male or female characters in Friends of George's productions. *See* ECF 81 at PageID 1065:18–23. Some or all of these persons were identified by name at trial. *Id.*

6. The purpose of Friends of George's is to provide a safe space—outside bars and clubs—for members and allies of the LGBTQ community to gather and to raise money to support other LGBTQ non-profit organizations. ECF 81 at PageID 1064:19-22.

7. Friends of George's also considers itself "a writing and production" team, ECF 81 at PageID 1065:2–4, with a creative-expression purpose that exists independently of how much money its shows manage to raise, *see id.* at PageID 1116:6–17. As such, Friends of George's might consider a particular show "a success in terms of expression" even though that show lost money, or, conversely, a failure in terms of expression even though that show raised substantial money. *See id.* at 18–21.

8. Friends of George's performs most of its shows at Evergreen Theatre and has "pop-up" shows at various other locations. ECF No. 69 (Pretrial Order) PageID 955, 3; ECF 81 1069:22-25, 29:1-6.

9. Evergreen Theater is located within the territorial boundaries of Tennessee's Thirtieth Judicial District. *See* ECF 81 1069:20–21.

10. Evergreen Theatre does not impose an age restriction or check identification of its patrons attending Friends of George's shows. ECF 81 at PageID 1069:13-16.

11. Friends of George's does not know the age of every person who attends its performances. ECF 81 at Page ID 1069:15–16.

12. When Friends of George's performs "pop-up" shows at venues other than the Evergreen Theater, it has no control over the pop-up venues' respective age restrictions. ECF 81 at PageID 1070:3–6.

13. Friends of George's also posts videos of its performances on YouTube and has no control over the ability of viewers to enjoy its content. ECF 81 at PageID 1070:11-25, 1071:1; 44:11-14.

14. Friends of George's members collaborate to write, produce, direct, and perform original works. ECF 81 at PageID 1064:23-25, 1065:1-12.

15. Friends of George's skits, or parts thereof, also involve improvisation from personas or characters. ECF 81 at PageID 1086:20-25; 1087:1-9, 23-25; 1088:1-19.

16. While drag is not inherently sexual, many of Friends of George's shows involve descriptions or representations of sexual content. ECF 81 at PageID 1068:22-24.

17. Friends of George's skit, "The Tea with Sister Myotis," features five male or female impersonators and includes descriptions of masturbation and ultimate sex acts that arguably violate Tenn. Code Ann. § 39-17-901(14)(B); ECF 81 at PageID 1082:3-5, 13-18.

18. Friends of George's sketch, "Nurses" from the "Drag Rocks" show features several male or female impersonators and includes descriptions and representations of excretory functions that arguably violate Tenn. Code Ann. § 39-17-901(14)(B). ECF 81 at PageID 1075:5-12.

19. Friends of George's sketch "Rod Stewart" from the "Drag Rocks" show features several male or female impersonators and includes representations of simulated ultimate sex acts that arguably violate Tenn. Code Ann. § 39-17-901(14)(A). ECF 81 at PageID 1075:13-25, 35:1-12.

20. Friends of George's sketch "Paradise by the Dashboard Light" from the "Dragnificent 70s" show features several male or female impersonators and includes representations of simulated ultimate sex acts that arguably violate Tenn. Code Ann § 39-17-901(14)(A). ECF 81 at PageID 1083:3-11.

21. Friends of George's sketch "Bitch You Stole my Purse" features several male or female impersonators and includes descriptions and representations of simulated ultimate sex acts that arguably violated Tenn. Code Ann. § 39-17-901(14)(A). ECF 81 at PageID 1077:5-25, 1078:1-3.

22. Friends of George's sketch "Bitch You Stole my Purse" features several male or female impersonators and includes a description of an excretory function that would arguably violate Tenn. Code Ann. § 39-17-901(14)(B). ECF 81 at PageID 1077:18–19.

23. Friends of George's performer "Trixie Thunderpussy," a female impersonator, performs a song describing female genitals in a state of sexual arousal that would arguably violate Tenn. Code Ann. § 39-17-901(6), (15).

24. Friends of George's sketch "Rod Stewart" from the "Drag Rocks" show features several male or female impersonators and includes representations of male genitals in a state of sexual arousal that arguably violates Tenn. Code Ann. § 39-17-901(6), (15). ECF 81 at PageID 1078:4-25.

25. Friends of George's sketch "Rod Stewart" from the "Drag Rocks" show features several male or female impersonators and includes representations of male genitals in a discernably turgid state that arguably violates Tenn. Code Ann. § 39-17-901(6), (9). ECF 81 at PageID 1076:13-25; 1077:1-4.

26. Friends of George's sketch "Dick in a Box" features several male or female impersonators and includes representations of male genitals in a discernably turgid state that arguably violates Tenn. Code Ann. § 39-17-901(6), (9). ECF 81 at PageID 1078:4-25.

27. The content of Friends of George's performances enumerated above, and discussed and viewed at trial, is typical of the content Friends of George's shows contain. *See* ECF 81 at PageID 1071:7–22.

28. Friends of George's performances arguably could be found by the average person applying contemporary community standards to appeal predominately to the prurient, shameful or morbid interests of minors as those terms are defined in Tenn. Code Ann. § 39-17-901. ECF 81 at PageID 1114:25; 1115:1-20; 1117:7-13.

29. Friends of George's performances arguably could be patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for minors as those terms are defined in Tenn. Code Ann. § 39-17-901. ECF 81 at PageID 1117:7-13.

30. Friends of George's performances as a whole arguably could lack serious literary, artistic, political or scientific values for minors as those terms are defined in Tenn. Code Ann. § 39-17-901. ECF 81 at PageID 1114:17-24.

31. Friends of George's shows may be suitable for teenaged-minors but not for younger-minors. ECF 81 at PageID 1114:2-24.

32. Friends of George's writers altered the content of their most recent show, "Drag Rocks" in anticipation of possible enforcement of the Act. ECF 81 at PageID 1086:21 – 1087:5

33. Friends of George's altered the content of "Drag Rocks" after the passage of the Act but prior to the entry of the Temporary Restraining Order in this case—at a time when it appeared the Act might take effect prior to the show's opening night. *See* ECF 81 at PageID 1086:6–14.

34. Because of the Act, Mid-South Pride suffered a decrease in support from sponsors. ECF 81 at PageID 1089:11 – 1094:18.

35. Because of the Act, Mid-South Pride saw a significant decrease in applications from drag performers to participate in planned entertainment. ECF 81 at PageID 1093:3-24.

36. Because of the Act, the board of Franklin Pride, TN chose to eliminate all drag entertainment from their planned 2023 Pride Festival. ECF 81 at PageID 1123:1-11; 1125:9-1126:12; 1127:7-12.

37. The enumerated effects of the Act on Mid-South Pride and Franklin Pride, as well as prospective sponsors and performers at the respective pride festivals, illustrate and are typical of the manner and degree to which the Act will harm LGBTQ organizations and chill free expression if permitted to take effect. *See* ECF 82 at PageID 1042:14–17.[1]

38. Defendant has indicated an intent to enforce the statute in accordance with his constitutional responsibilities. ECF No. 69 at PageID 995.

39. In recent months, Friends of George's has received numerous threats from community members who find the content of Friends of George's performances patently offensive

---

[1] While counsel's statements do not stand as substantive testimony per se, this Court may consider those statements, to the extent they clarify the purpose for which substantive testimony was offered, in reaching its findings of fact.

and lacking in redeeming value, at least with respect to minors. *See* ECF 81 at Page ID 1117: 7–13.

40.  Numerous letters from members of various communities across Tennessee, addressed to the Court and made a part of the electronic record in this case, demonstrate that a non-trivial percentage of the populations of communities across the state consider drag performances per se harmful to minors, patently offensive with respect to minors, and lacking in any redeeming value for minors. ECF Nos. 33, 33-2–3, 71–76, 76-1–15, 77, 77-1–9, 83, 83-1–3, 84, 84-1.

**Plaintiff's Proposed Conclusions of Law:**

Plaintiff, Friends of George's, Inc., proposes and respectfully asks the Court to adopt the following conclusions of law:

1. A Plaintiff satisfies the injury-in-fact requirement necessary for pre-enforcement review where it alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

2. Because Defendant has asserted that he intends to enforce Tenn. Code Ann. §7-51-1407 and its cross-referenced statutes, collectively called "The Adult Entertainment Act" ("the Act") if this Court does not grant an injunction, there exists a credible threat of prosecution for anyone who violates the Act. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).

3. Plaintiff has organizational standing because the both enforcement and the threat of enforcement would frustrate its organizational purposes of performing theater featuring male and female impersonators and providing LGBTQ theater events in all-ages settings

outside of bars and nightclubs. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982).

4. Plaintiff also has independent standing because Plaintiff itself faces a risk of enforcement of the Act against it through Tennessee's criminal facilitation statute, which makes a person, including a corporate entity, criminally responsible for knowingly furnishing substantial assistance in the commission of any felony. Tenn. Code Ann. § 39-11-403; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). Plaintiff itself, through its board members and agents, contracts for and furnishes the Evergreen Theater to Plaintiff's performers. Plaintiff conducts ticket sales and collects revenues. Plaintiff provided evidence of those revenues and ticket sales to the Court. Accordingly, Plaintiff itself facilitates Friends of George's performances and faces a risk of enforcement of the Act against it via the criminal facilitation statute. Plaintiff faces the risk of a Class A or B misdemeanor for violations of the Act by its performers. Tenn. Code Ann. § 39-11-403(b).

5. Plaintiff has associational standing, because every performing member of Friends of George's has standing to bring suit in their own right and/or because Plaintiff has identified individual members by name who, at the time of filing suit, had and continue to have standing in their own right as performers whose speech arguably falls within the scope of § 7-51-1407. Plaintiff's purpose is both consistent with and dependent upon the protected speech of its performers, and the interests of the individual performers are so intrinsically bound up with those of Plaintiff that their individual participation is not necessary. *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 9 (1988).

6. The Act is a content-based regulation on protected speech, because it "applies to particular speech because of the topic discussed or the idea or message expressed," specifically content that is not obscene *per se* but that may be inappropriate for minors. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Reno v. ACLU*, 521 U.S. 844, 868 (1997).

7. The Act is viewpoint discriminatory, because the proscribed speech is defined in part by the identity of the speaker, "distinguishing among different speakers, allowing speech by some but not others" which is "all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340, (2010). By focusing on the identity of the speaker, the Act risks censoring the speech of disfavored categories of speakers based on "the specific motivating ideology . . . or perspective of the speaker." *Reed v. Town of Gilbert*, 576 U.S. at 163.

8. Because the Act is content based and not viewpoint neutral, it is presumptively invalid. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992).

9. Because the Act is content based and not viewpoint neutral, it must survive strict scrutiny to be constitutional. *Reed*, 576 U.S. at 171 (2015).

10. To survive strict scrutiny, the Act must be justified by a compelling government interest and must be narrowly drawn to serve that interest. *Reed*, 576 U.S. at 175 (Breyer, J., concurring) (stating that strict scrutiny in speech cases is "almost certain legal condemnation").

11. Because the law is not content neutral, it is not a time, place, and manner restriction. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

12. Laws that purport to regulate content that is not obscene but is indecent or inappropriate to minors are not content-neutral and are therefore not properly analyzed as time, place, and manner restrictions. *Reno v. ACLU*, 521 U.S. at 868.

13. The secondary effects doctrine does not apply, because the Defendant asserts that the Act's purpose is to protect minor children from speech that is harmful to minors because the speech itself could make them susceptible to sexual predation. This is not a "secondary effect" of speech like drugs and prostitution in the vicinity of adult oriented businesses, but instead purports to "protect children from the alleged 'primary effects' of the speech itself, rather than any 'secondary' effect of such speech." *Reno v. ACLU*, 521 U.S. at 868.

14. The alleged "secondary effect" that Defendant claims the law is designed to prohibit, sexual exploitation of children, can be and actually is regulated directly by numerous statutes, including Tennessee's public indecency statute, Tenn. Code Ann. § 39-13-517. Problematically, public indecency is a Class B misdemeanor punishable only by a $500 fine. *Id.* If a performer described in the Act were to engage in exactly the same conduct as the conduct prohibited by the public indecency statute in exactly the same locations as part of a "performance," then the performer would be subject to imprisonment for a Class A misdemeanor or, for a second offense, a Class E felony. Tenn. Code Ann. §7-51-1407. If the legislature were truly attempting to regulate the secondary effect of child sexual exploitation, it could have done so directly and by regulating the conduct of the public at large, not merely certain categories of disfavored speakers.

15. Even if the Act were facially content-neutral, it is subject to strict scrutiny because "an impermissible purpose or justification underpins the law," because the law's purpose is to

10

limit speech, including speech by Plaintiff and other, "similar" speakers based on their identity. Nothing in the legislative history suggests that the law was passed for any other purpose, and, indeed, the floor debates themselves appear to suggest that the legislature considered the fact that the law targeted specific groups of speakers, specifically "male and female impersonators" and chose to pass the Act as currently written despite the concerns of legislators that singling out certain types of speakers threatened the constitutionality of the statute. *Reed. v. Town of Gilbert*, 576 U.S. 155, 166 (2015).

16. While the government has a compelling interest in protecting children from sexually explicit content that may be harmful to them, the government does not have a compelling interest in protecting children from harmful content only from certain speakers, as it has done here. "[D]istinguishing among different speakers, allowing speech by some but not others" is "all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340, (2010).

17. The Act is not narrowly tailored, because it is not the least restrictive way to protect children from sexually explicit content. *Ashcroft v. ACLU*, 542 U.S. 656, 671 (2004). The Act is less narrowly tailored than the Child Online Protection Act, the law at issue in *Ashcroft*, which contained an affirmative defense for parental consent, regulated only commercial conduct, and that contained a substantially identical definition of "harmful to minors." *ACLU v. Mukasey*, 534 F.3d 181, 188 (2008).

18. The definition of "harmful to minors" referenced by the Act are constitutionally infirm for the same reasons that the Third Circuit held the definitions at issue in COPA invalid. *ACLU v. Mukasey*, 534 F.3d 181, 190-91 (2008). The Court is not bound by the Tennessee Supreme Court's limiting construction of the term "minor" as that term was

used in the display statute under review in *Davis-Kidd Booksellers v. McWherter*, 866 S.W.2d 520, 528 (Tenn. 1993). First, the *Davis-Kidd* Court was not interpreting the law currently under review. It was interpreting the definition of "harmful to minors" in the context of a display statute, Tenn. Code Ann. § 39-17-914. *Id.* Because the reasoning the Tennessee Supreme Court employed was limited to the display statute itself and would be nonsensical when applied to the statute at issue in this case, the Court finds the Defendant's argument that this Court is bound by that limiting construction unpersuasive. That limiting construction also predates *Reno, Ashcroft, and Mukasey*, all of which tend to contradict the *Davis-Kidd* Court's reasoning. The Court finds the Third Circuit's analysis of the definition of "minor" in *Mukasey* both more consistent with current precedent and more applicable to the statute under review. *Mukasey*, 534 F.3d at 190.

19. The Act regulates non-commercial speech, even speech in private homes by private speakers, a regulation far more intrusive than that at issue in *Ashcroft/Mukasey*. *ACLU v. Mukasey*, 534 F.3d 181, 191-92 (2008).

20. The plain language of the Act penalizes speakers for where they perform. Even applying the government's preferred narrowing construction of the Act's broad prohibition on location, "anywhere that cards at the door," the speaker likely has no control over who enters the premises. Tenn. Code Ann. § 7-51-1407(c).

21. Further, the plain language of the act criminalizes anyone who "performs adult cabaret entertainment," which is defined as any "performances that are harmful to minors and that <u>feature</u>. . . male and female impersonators." The plain language of the Act does not prohibit performances *by* an individual, but instead participation in performances that include one of the proscribed speakers and content that is "harmful to minors" as that

term is defined in the display statute found at Tenn. Code Ann. § 39-17-901. Thus, the statute criminalizes individuals for merely appearing on stage with performers who directly violate the Act. Tenn. Code Ann. § 7-51-1401 & 1407. The Act therefore sweeps up a vast amount of speech that is neither unprotected by the First Amendment nor "harmful to minors" as that term is defined in the display statute found at Tenn. Code Ann. § 39-17-901.

22. Even if the Court reads a *mens rea* requirement into the statute as it relates to the content of the speech in question, as the Defendant has argued, the Act imposes no *mens rea* requirement as it relates to whether minors are present or "could be" present in the location of the performance. Tenn. Code Ann. § 7-51-1407.

23. The legislature could have employed clearer definitions as to the precise conduct prohibited that took account of modern First Amendment precedent rather than relying on definitions cross-referenced from a display statute in which the definition of "minor" was reasonably subject to a narrowing construction because the statute in issue related only to the location where sexually explicit materials were displayed and because of the "minimal" burdens imposed on the exclusively commercial retailers that the statute regulated. *Davis-Kidd Booksellers v. McWherter*, 866 S.W.2d 520, 528 (Tenn. 1993).

24. The legislature could have narrowed the scope to commercial conduct and regulated the owners or operators of locations that host performances rather than the performers themselves.

25. The display statute from which the definition of "harmful to minors" is drawn, Tenn. Code Ann. § 39-17-914, is a Class C misdemeanor punishable by a fine, regulates only commercial display of materials in the store, and requires only "reasonable steps" to

prevent a minor from seeing the materials. The statute contains a defense for parental consent. Unlike the display statute, the performers whose speech is impacted by the Act must choose between only performing in venues that can guarantee steps to ensure that minor children are not merely admitted, but that could not even view the performance through a window. They face incarceration and potentially felony conviction. They need not be engaged in commercial activity, and there is no defense for parental consent. Tenn. Code Ann. § 7-51-1407; *Davis-Kidd Booksellers v. McWherter*, 866 S.W.2d 520, 528 (Tenn. 1993).

26. The Act is unconstitutionally overbroad, because it unnecessarily sweeps in a large amount of protected speech by regulating not only ultimate sex acts, but also "that quality of any description or representation, in whatever form, of nudity, sexual excitement, sexual conduct, excess violence, or sadomasochistic abuse." *Broadrick v. Oklahoma*, 413, U.S. 601, 610 (1973).

27. The Act is unconstitutionally vague, because it does not provide explicit standards to law enforcement officers and would permit "arbitrary and discriminatory application" of the law. Both the Act's definition of "harmful to minors" and in its prohibition on performances "anywhere it could be viewed by a person who is not an adult," give little meaningful guidance to performers or law enforcement about what is prohibited and where it is prohibited, creating a serious danger of such arbitrary and discriminatory application. Worse, the statute's criminalization of a "performance" rather than the discreet acts of individuals, runs a serious risk that law enforcement officials with arbitrarily enforce the statute against individuals against whom it could never possibly be applied constitutionally. *Grayned v. City of Rockford*, 408 U.S. 104, 108-9 (1972).

While the Court "may interpret 'ambiguous statutory language' to 'avoid serious constitutional doubts,' . . . "that canon of construction applies only when ambiguity exists." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019). Courts cannot "rewrite a law to conform it to constitutional requirements." *Id.* This Court rejects the Defendant's myriad proposed narrowing constructions, such as, *inter alia*, interpreting "minor" to mean a reasonable seventeen-year-old; reading "anywhere it might be viewed by someone who is not an adult" to mean venues that "card at the door;" interpreting the term "performances that are harmful to minors and that feature. . . male and female impersonators" to mean discreet acts by individual performers; and construing "similar performers" to mean any performer who engages in conduct that would violate the Act in order to render the Act viewpoint neutral. (This last construction would actually broaden enforcement of the Act rather than narrow it.) A narrowing construction of that nature would be to rewrite the law to conform to constitutional requirements and, oddly, to impose provisions expressly raised in the legislative history that the General Assembly chose not to include in the statute.

Dated May 27, 2023

        Respectfully submitted,

        /s/ *Brice M. Timmons*  (with permission by JWB)
        Brice M. Timmons (#29582)
        Melissa J. Stewart (#40638)
        **DONATI LAW, PLLC**
        1545 Union Ave.
        Memphis, Tennessee 38104
        (901) 278-1004 (Office)
        (901) 278-3111 (Fax)
        Brice@donatilaw.com
        Melissa@donatilaw.com

        /s/ *Jacob Webster Brown*
        Jacob Webster Brown (TN 36404)
        Sara Katherine McKinney (TN40900)
        Apperson Crump, PLC
        6000 Poplar Avenue, Suite 150
        Memphis, Tennessee 38119
        (901) 756-6300 (Office)
        (901) 757-1296 (Fax)
        jbrown@apperconcrump.com
        smckinney@appersoncrump.com

        *Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was served upon all parties of record via the Court's ECF system on May 27, 2023.

        /s/ *Jacob Webster Brown*

16